**C.N.S. ENTERPRISES, INC., et al.,**
**Plaintiffs-Appellants,**

v.

**G. & G. ENTERPRISES, INC., et al.,**
**Defendants-Appellees.**

**No. 73–2073.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 12, 1974.

Decided Jan. 13, 1975.

Russell J. Hoover, Chicago, Ill., for plaintiffs-appellants.

Edmund P. Boland, Howard L. Fink, Zave H. Gussin, Chicago, Ill., for defendants-appellees.

Before CASTLE, Senior Circuit Judge, and STEVENS and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

The sole issue presented is whether promissory notes delivered to a bank for loans used to purchase the assets of a small business enterprise constitute "securities" under the Securities Exchange Act of 1934, investing the maker of the notes with a jurisdictional basis for bringing suit in the federal courts.

## I

According to the complaint, the "Village Well" is a coin-operated laundry and dry cleaning business located in Justice, Illinois, which had been owned and operated by defendants Giselle Strausburger, Gladys Lucas and G. & G. Enterprises, Inc., in accordance with a license agreement from defendants Robert W. Casey and Kimlis Sales Company.

On January 20, 1972, the plaintiffs purchased the fixtures, merchandise, business and good will of the Village Well from Strausburger, Lucas and G. & G., having given Kimlis a promissory note for $5,000 as an earnest money deposit. As part of the transaction, the plaintiffs also (1) assumed a chattel mortgage in the amount of $73,515.26 on the fixtures, which mortgage was held by defendant National Bank of Austin,

(2) gave the Austin Bank an "evidence of indebtedness" in like amount, (3) borrowed an additional $20,000 from the Austin Bank evidenced by a note secured by a junior chattel mortgage, and (4) paid a portion of the non-specified purchase price to Strausburger, Lucas and G. & G.

Plaintiffs alleged that from September through December 1971, defendants Strausburger, Lucas and Casey represented orally and in writing that the monthly sales of the Village Well ranged from $4,500 to $5,500, that October 1971 sales were about $4,800, that November 1971 sales were $5,700, that December 1971 sales would exceed those of November, and that defendants displayed to plaintiffs books and records purporting to reflect such sales. Plaintiffs further alleged that these representations were all false and that the books and records failed to reveal accurately the actual sales.

The plaintiffs operated the business for approximately four months, spending substantial sums in promoting the business, suffering financial losses and borrowing additional capital funds to carry on. On May 19, 1972, plaintiffs sent defendants a notice of rescission. Since May 28, the Village Well has been operated by Casey and Kimlis.

Plaintiffs sought rescission of all agreements with defendants, repayment of consideration paid and cancellation of obligations assumed. Plaintiffs relied exclusively for federal jurisdiction upon section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j) and Rule 10b–5 thereunder (17 C.F.R. § 240.10b–5).

All six defendants filed motions to dismiss on the ground that the 1934 Act does not apply to this transaction and therefore that federal jurisdiction does not lie.

The district court denied all motions on May 2, 1973, but, on motions for reconsideration, vacated that order. On September 26, 1973, the motions by all defendants to dismiss were granted "for reasons stated in the record." The

record discloses that the court concluded that a "commercial" note, particularly one not subjected to further trading, as distinguished from an "investment" note, is not a security within the 1934 Act.

## II

As we pointed out in Sanders v. John Nuveen & Co., Inc., 463 F.2d 1075, 1078 (7th Cir.), cert. denied, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972), the six basic federal securities acts each includes "any note" within its definition of "security."[1] However, the 1933 Act exempts from registration, but not from the antifraud provisions of that act, any note "which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity . . . not exceeding nine months."[2] The 1934 Act excludes from the definition of a "security," "any note . . . which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."[3]

In Sanders, we held that promissory notes with a maturity not exceeding nine months but offered to the public as an investment are "securities" within the meaning of the 1934 Act despite the broad implications of the exception inasmuch as Congress obviously intended to protect such investors against fraud. 463 F.2d at 1079–1080. We said:

> In other words, when Congress spoke of notes with a maturity not exceeding nine months, it meant commercial paper, not investment securities. When a prospective borrower approaches a bank for a loan and gives his note in consideration for it, the bank has purchased commercial paper. But a person who seeks to invest his money and receives a note in return for it has not purchased commercial paper in the usual sense. He has purchased a security investment.

Id. at 1080.

In effect, we are now called upon to consider a situation which is the reverse of Sanders. In Sanders we applied a congressional - intent-revealed-in - context approach as against a literal-text-reading of "any note [with] a maturity . . . of not exceeding nine months" as those words are used in the exemption portion of the security definition of the 1934 Act, in order to avoid the exemption in the case where the short-term notes were offered to the investing public intended by Congress to be protected. Here we are asked to give the same context-over-text consideration to "any note" as those words are used in the security definition itself of the 1934 Act, in order to avoid federal jurisdiction of transactions claimed to fall beyond the protection intended by Congress in the enactment of the securities laws.

Analysis immediately reveals, however, much more serious differences between the two situations than the superficial analogy might lead one to believe. In Sanders, the effect of the contextual interpretation led to the non-application of an exemption and therefore to the inclusion of a kind of instrument within the protection of the 1934 Act. The effect of applying the same interpretation to the definition itself would lead to the exclusion of a type of instrument from the protection of the 1934 Act. When

1. Securities Act of 1933, § 2(1), 15 U.S.C. § 77b(1); Securities Exchange Act of 1934, § 3(a)(10), 15 U.S.C. § 78c(a)(10); Public Utility Holding Company Act of 1935, § 2(a)(16), 15 U.S.C. § 79b(a)(16); Trust Indenture Act of 1939, § 303(1), 15 U.S.C. § 77ccc(1); Investment Company Act of 1940, § 2(a)(36), 15 U.S.C. § 80a–2(a)(36); and Investment Advisors Act of 1940, § 202(a)(18), 15 U.S.C. § 80b–2(a)(18).

2. Section 3(a)(3), 15 U.S.C. § 77c(a)(3). For a discussion of the "current transactions" con-

cept, see Comment, The Commercial Paper Market and the Securities Act, 39 U.Chi.L. Rev. 362, 387–89 (1972). Moreover, the words "current transaction" twice used by Congress in the exemption emphasize the immediate need for funds by a borrower as opposed to long-term employment of funds by an investor.

3. Section 3(a)(10), 15 U.S.C. § 78c(a)(10).

the Supreme Court has spoken of construing federal securities legislation "not technically and restrictively, but flexibly to effectuate its remedial purposes,"[4] it has been speaking of expanding the reach of protection, not diminishing it; of increasing the types of covered documents and transactions, not of decreasing them; of avoiding more frauds, not less.

The inherent difficulty in purporting to find that Congress intended to limit the reach of federal jurisdiction exercised through securities legislation when it used the words "any note" is therefore compounded by the fact that the Supreme Court was in the process of expanding that jurisdiction when it searched for and expounded the congressional intent behind the securities acts. Under these circumstances it is understandable that courts have been struggling to answer the question here: are the securities acts invoked every time a person borrows money from a bank and gives his promissory note in return?

## III

In SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 350–351, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943), the Supreme Court, after noting that the defendants had invoked the *ejusdem generis* rule and the *expressio unius est exclusio alterius* maxim in interpreting the definition of a security under the 1933 Act, said:

> However well these rules may serve at times to aid in deciphering legislative intent, they long have been subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy.

*Id.*

In SEC v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), the Court, citing *Joiner,* said:

> The meaning of particular phrases must be determined in context . . . . Congress itself has cautioned that the same words may take on a different coloration in different sections of the securities laws; both the 1933 and 1934 Acts preface their lists of general definitions with the phrase "unless the context otherwise requires." 1933 Act, § 2, 48 Stat. 74, 15 U.S.C. § 77b; 1934 Act, § 3, 48 Stat. 882, 15 U.S.C. § 78c.

*Id.* at 466, 89 S.Ct. at 571–572.

> "Finally, we are reminded that, in searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality. SEC v. W. J. Howey Co., 328 U.S. 293, 298, 66 S.Ct. 1100, 1102, 90 L.Ed. 1244 (1946)." Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). See also, Milnarik v. M–S Commodities, Inc., 457 F.2d 274, 275–276 (7th Cir.), cert. denied, 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972).

Accordingly, we commence our analysis with the language of the statutes.[5] In the 1933 Act, the opening words of section 2 read (15 U.S.C. § 77b):

> Sec. 2. When used in this title, unless the context otherwise requires—
>
> (1) [t]he term "security" means any note . . . .

The only difference in the 1934 Act is the immaterial one that nine other definitions intercede between the contextual proviso and the security definition (15 U.S.C. § 78c):

> Section 3. (a) When used in this title, unless the context otherwise requires—
>
> \*    \*    \*    \*    \*    \*

---

4.   SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195, 84 S.Ct. 275, 285, 11 L.Ed.2d 237 (1963).

5.   In interpreting the definition of a security in the 1934 Act, the Supreme Court has sanctioned recourse to the 1933 Act. Tcherepnin v. Knight, 389 U.S. 332, 335–336, 338, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

(10) The term "security" means any note . . . .

Inasmuch as Congress specified the context-over-text approach in both acts,[6] the next step is to discover what "context" applies in the circumstances of this case.

In Eason v. General Motors Acceptance Corp., 490 F.2d 654 (7th Cir. 1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974), this court rejected the purchaser-seller "standing" rule of the *Birnbaum* case [7] in favor of an identification of persons to whom the 1934 Act, and particularly section 10(b) and Rule 10b–5, extended protection as members of the class for whose special benefit the statute was enacted. In *Eason,* Judge Stevens said:

> Congress, the Supreme Court, and the Commission have all used the term "investors" to describe the class of persons protected by Rule 10b–5.
>
> \*   \*   \*   \*   \*   \*
>
> The emphasis on the injured party's status as an investor indicates that the protection of the rule extends to persons who, in their capacity as investors, suffer significant injury as a direct consequence of fraud in connection with a securities transaction, even though their participation in the trans-

action did not involve either the purchase or the sale of a security.

*Id.* at 659.

Judge Stevens pointed out the language of section 10(b) itself: [8]

> It shall be unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or *for the protection of investors.*

15 U.S.C. § 78j (emphasis added).

He concluded:

> [I]n each case the plaintiff will have to demonstrate membership in the "special class" protected by Rule 10b–5 and injury as a direct consequence of the alleged violation.

490 F.2d at 660.

The *Eason* test is applicable here in defining a security. In SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), the Supreme Court noted that:

> In the Securities Act the term "security" was defined to include by

---

**6.** The American Law Institute's tentative draft of the Federal Securities Code (Professor Louis Loss, Reporter), retains the "context" language, stating that "[t]he definitions . . . apply for purposes of this Code and the rules thereunder unless the context requires otherwise." ALI Fed. Securities Code § 201(a) (Tent. Draft No. 1, April, 1972). The Comment to this section notes that "[i]t seems advisable not to risk an inference of intended rigidity from deletion of this caveat, however redundant it may be under the modern approach to statutory construction." The Comment continues:

> A good example of the text-context clash, still unresolved, is the question whether the discounting of an ordinary promissory note by either the maker or the payee is a "sale" of a "security" to the bank . . . .
>
> . . . . [T]his problem does not lend itself to precise statutory solution. Too much depends on highly variegated circumstances.

**7.** Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

**8.** He also looked to language of Mr. Justice Douglas in his opinion in Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 10, 12–13, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), where reference was twice made to the Rule 10b–5 protection against injury "as an investor." It should also be noted that the Senate Report accompanying what became the 1933 Act stated that "[t]he purpose of this bill is to protect the investing public and honest business." S.Rep.No.47, 73d Cong., 1st Sess. 1 (1933). The Senate Report accompanying what became the 1934 Act stated that section 10(b) "authorizes the Commission . . . to prohibit or regulate . . . practices which it finds detrimental to the interests of the investor." S.Rep.No.792, 73d Cong., 2d Sess. 18 (1934).

name or description many *documents in which there is common trading for speculation or investment* . . . such as notes . . . .

*Id.* at 351, 64 S.Ct. at 123 (emphasis added).

The Supreme Court particularly considered the definition of "security" in the 1934 Act in Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967):

> One of [the] central purposes [of the 1934 Act] is *to protect investors* through the requirement of full disclosure by issuers of securities, and the definition of security in § 3(a)(10) necessarily *determines the classes of investments and investors which will receive the Act's protections.*

*Id.* at 336, 88 S.Ct. at 553 (emphasis added).

The ultimate question is whether the plaintiffs are simply borrowers in a commercial transaction who are not protected by the 1934 Act or investors in a securities transaction who are protected.[9]

## IV

In one sense every lender of money is an investor since he places his money at risk in anticipation of a profit in the form of interest. Also in a broad sense every investor lends his money to a borrower who uses it for a price and is expected to return it one day.

On the other hand, the polarized extremes are conceptually identifiable: buying shares of the common stock of a publicly-held corporation, where the impetus for the transaction comes from the person with the money, is an investment; borrowing money from a bank to finance the purchase of an automobile, where the impetus for the transaction comes from the person who needs the money, is a loan. In between is a gray area which, in the absence of further congressional indication of intent or Supreme Court construction, has been and must be in the future subjected to case-by-case treatment.

The Second Circuit held in Movielab, Inc. v. Berkey Photo, Inc., 452 F.2d 662 (2d Cir. 1971), that "notes issued by one publicly owned company to another publicly owned company for $10,500,000, payable over a period of 20 years, in exchange for the assets of the latter easily fall within the purview of the [1934] Act . . . ."[10]

After our decision in *Sanders, supra,* where we held that notes with a maturity not exceeding nine months but offered to the public as an investment were securities under the 1934 Act,[11] the Second Circuit in Zeller v. Bogue Electric Manufacturing Corp., 476 F.2d 795 (2d Cir.), cert. denied, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973), agreed with *Sanders* that "the mere fact that a note has a maturity of less than nine months does not take [it] out of Rule 10b–5, unless [it] fits the general notion of 'commercial paper' . . . ." *Id.* 476 F.2d at 800. In holding that a note issued by a parent corporation to its subsidiary for loans by the subsidiary in the amount of $315,310 to assist the parent's operating losses and deteriorating working capital position, was a security, Judge Friendly said:

> It does not follow, however, that every transaction . . . which involves promissory notes, whether of

---

**9.** Material misrepresentations were sufficiently pleaded and the applicability of the 1934 Act and Rule 10b–5 depends entirely upon the definition of "security."

**10.** The court refused to deal with the "hypothetical situation" of whether "the issuance of notes in every private loan transaction" comes within the scope of the 1934 Act." 452 F.2d at 663.

**11.** $1,661,500 in notes were offered to and purchased by 42 investors. In addition, we relied upon Securities and Exchange Commission's Release No. 33–4412:

> The legislative history of the [1933] Act makes clear that section 3(a)(3) applies only to prime quality negotiable *commercial paper of a type not ordinarily purchased by the general public,* that is, paper used to facilitate well recognized types of current operational business requirements and of a type eligible for discounting by Federal Reserve banks.

26 Fed.Reg. 9159 (1961) (emphasis added).

less or more than nine months maturity, is within Rule 10b–5. The Act is *for the protection of investors,* and its provisions must be read accordingly. . . . [W]e see no reason to doubt that Belco [subsidiary] stood in the position of an investor, although perhaps an involuntary one, with respect to Bogue [parent].

*Id.* (emphasis added).

The Third Circuit held in Lino v. City Investing Co., 487 F.2d 689 (3d Cir. 1973), that there was no federal jurisdiction over material misstatements made in connection with Lino's purchase from the franchiser of two franchise licensing agreements, partially with cash and partially with several promissory notes. Judge Hunter said:

These were personal promissory notes issued by a private party. There was no public offering of the notes, and the issuer was the person claiming to be defrauded. The notes were not procured for speculation or investment, and there is no indication that [the franchiser] was soliciting venture capital from Lino.

\*   \*   \*   \*   \*   \*

[The franchiser] was selling a certain contract right to Lino, not buying his security. It simply lacks common sense to describe the transaction as [the franchiser] purchasing . . . Lino's security by paying him the right to operate one of its Franchise Sales Centers.

*Id.* at 694–695.

The Fifth Circuit considered what it has called "the commercial-investment dichotomy" in four recent cases. In United States v. Rachal, 473 F.2d 1338, 1342–1343 (5th Cir.), cert. denied, 412 U.S. 927, 93 S.Ct. 2750, 37 L.Ed.2d 154 (1973), a criminal case under the 1933

Act, the court approved an instruction given by the trial court which provided that the exemption of short-term notes from the registration provisions of the 1933 Act applied only to commercial not investment paper (that is, the *Sanders* rationale).

In Bellah v. First National Bank, 495 F.2d 1109 (5th Cir. 1974), the court held that a promissory note of six-months maturity, secured by a deed of trust on real property, issued for a bank loan needed by the makers (husband and wife) to aid them in the development of their livestock business, was commercial paper and not investment paper and hence the note and deed were not securities.[12]

In McClure v. First National Bank, 497 F.2d 490 (5th Cir. 1974), a one-year promissory note and a deed of trust issued for a bank loan alleged to be needed to pay the corporate obligations of a closely-held corporation, were held not to be securities. Judge Roney analyzed prior federal decisions and concluded:

The cases excluding certain notes from the coverage of the Act generally involved underlying transactions between payor and payee which were not of an investment nature. . . .

On the other hand, where notes have been deemed securities within the meaning of the securities laws, either of two factors, not present here, usually indicated the investment overtones of the underlying transactions. [The notes were either] offered to some class of investors, [or] were . . . acquired . . . for speculation or investment . . . [or the borrower obtained] investment assets, directly or indirectly, in exchange for its notes.[13]

*Id.* at 493–494.

---

12. Judge Gewin articulated two possible effects of *not* applying the commercial-investment dichotomy, which he saw as indicia of congressional intent that it be applied: (1) subjection of ordinary commercial loan transactions to the registration requirements of the 1933 Act "would inevitably wreak havoc on the commercial paper market," and (2) complaints spawned by a commercial loan trans-

action should find recourse in state not federal courts. 495 F.2d at 1114.

13. Judge Roney also said:

We realize that our holding today that the Act does not apply to commercial notes of a longer duration than nine months, taken with the decisions voiding the short-term exemption as to investment paper, vir-

Finally, the Fifth Circuit held in SEC v. Continental Commodities Corp., 497 F.2d 516 (5th Cir. 1974), that promissory notes with a maturity date of less than nine months issued by a corporation in partial reimbursement to its customers who had held open accounts when the corporation's trading in commodities futures options was suspended by the California Commissioner of Corporations, were securities. Judge Gewin said:

> [I]t is the character of the note, not its maturity date, which determines coverage under both the registration provisions of the Securities Act of 1933, and the Securities Exchange Act of 1934.

> \*   \*   \*   \*   \*   \*

> The paramount concern in this inquiry is the nature of the transaction in which the note is issued.

> \*   \*   \*   \*   \*   \*

> [T]he notes [here] were issued to rejuvenate and not to liquidate the enterprise.   .   .   .

> Once the resuscitative nature of the notes is established, the conclusion is ineluctable that the notes were investment and not commercial paper. Since revival would inure to their benefit, recipients accepted the notes with the hope of realizing a greater return on their investments.

The commercial-investment dichotomy delineated to some extent in the foregoing courts of appeals cases has been further demarcated in recent district court cases: Avenue State Bank v. Tourtelot, 379 F.Supp. 250 (N.D.Ill.1974) (series of

tually writes that exemption out of the law. On one hand, the Act covers all *investment* notes, no matter how short their maturity, because they are not encompassed by the "any note" language of the exemption. On the other hand, the Act does not cover any *commercial* notes, no matter how long their maturity, because they fall outside the "any note" definition of a security. Thus, the investment or commercial nature of a note entirely controls the applicability of the Act, depriving of all utility the exemption based on maturity-length. The original

short-term notes issued by travel agency for bank loan to pay off current debts held not to be securities); Joseph v. Norman's Health Club, Inc., 336 F.Supp. 307 (E.D.Mo.1971) (promissory notes given for lifetime membership in health clubs held not to be securities); City National Bank v. Vanderboom, 290 F.Supp. 592, 608 (W.D.Ark.1968), aff'd, 422 F.2d 221 (8th Cir.), cert. denied, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970) (notes given by corporate organizers for bank loans to purchase corporation's capital stock held not to be securities).

A comprehensive and perceptive student comment suggests a long list of possible criteria to distinguish ordinary commercial notes not protected by the act from investment notes or investment securities protected by the act: (1) how is the instrument characterized in the business community? (2) how are the proceeds to be used (if for consumer goods or particular business goods or services—not covered, but if for general financing of borrower's enterprise—covered)? (3) extent of reliance on efforts of others (placing funds at great risk, giving note payee extensive collateral rights, making repayment of funds contingent upon some event, all tend to indicate security rather than loan); (4) number of notes issued, number of payees, dollar amount of transaction; (5) payable on demand or if payable at fixed time, how long is the time between issuance and maturity? and (6) characterization of notes on relevant financial statements. Comment, Commercial Notes and Definition of "Security" Under Securities Exchange Act of 1934: A Note Is a Note Is a Note? 52 Neb.L. Rev. 478, 510–24 (1973).

scrivener of the definitional section may well wonder what happened to his carefully drawn exemption on the way to the courthouse, but if the judicial decisions do not properly reflect the intent of Congress as to the coverage of the Act, only that body can properly rectify the situation at this point, if stare decisis is to apply and the Supreme Court does not make some definitive decision contrary to the presently decided cases.
497 F.2d at 494–495.

These criteria are helpful but each case appears to require its own decision based upon its own facts.[14]

The American Law Institute's tentative draft of the Federal Securities Code includes not only a definition of "security" but also sets forth certain items which are *not* included in the term "security" and hence are not subject to the registration, antifraud or other provisions. One of the exclusions is "a note or other evidence of indebtedness issued in a mercantile transaction." ALI Fed. Securities Code § 297(b)(3) (Reporter's Revision of Text of Tent. Drafts Nos. 1–3, Oct. 1974). However the term "mercantile transaction" is not defined.

The tentative code would exempt from registration requirements "commercial paper with a denomination of at least $100,000." *Id.* § 301(1). "Commercial paper" is defined as

> (a) a note or banker's or trade acceptance that is payable on demand or matures or is renewed for not more than nine months, exclusive of days of grace, after the date of issue or renewal, or (b) any other instrument or interest of primarily a mercantile character that the Commission designates by rule.

*Id.* § 216A.

Again, there is no definition of "mercantile character." So we are left ultimately with the necessity for a case-by-case factual determination.[15]

## V

Although we have gone into what we believe is the congressional and Supreme Court basis for the commercial-investment dichotomy at some length in the hope that prospective litigants in this circuit may be enlightened as to its possible parameters, the application of the rule is not difficult in this case.

Three promissory notes were involved in the present transaction. The $20,000 note secured by a chattel mortgage was given to the National Bank of Austin as evidence of a loan. The $73,515.26 note was given to the Austin Bank upon the assumption by the makers of a pre-existing chattel mortgage on the fixtures of the coin-operated laundry and dry cleaning business which the makers purchased. The complaint did not have attached thereto a copy of either note, which would have seemed a prudent procedure inasmuch as jurisdiction is dependent upon them, but in any event nothing alleged in the complaint indicated that these two notes represent anything beyond the borrowing of money to make partial payment upon the purchase of the assets of a business.

Nothing alleged in the complaint indicated in any way that the bank was an investor in the business or a co-partner

---

**14.** In Lino v. City Investing Co., 487 F.2d 689 (3d Cir. 1973), the court noted:

> Neither party has been able to suggest a "test" to us that would aid in determining whether there has been a purchase or sale of securities when a personal promissory note is involved. Each assures us that wherever the line is, he is on the safe side of it. The cases cited previously suggest that transactions involving a corporation's notes should be treated differently in some instances than similar transactions involving an individual's notes. . . .
>
> But we do not have to rule on that distinction now. Nor are we determining that in other circumstances transactions involving personal notes do not constitute the purchase or sale of securities. The courts will have to consider the complete context of each transaction in making their determinations.

*Id.* at 696 n. 15.

**15.** The conclusion of the authors of one analysis (Lipton and Katz, "Notes" Are (Are Not?) Always Securities—A Review, 29 Bus. Law. 861 (1974) is:

> Not every note is a security. The commercial context of the underlying transaction has to be evaluated. Notes issued for personal loans and consumer installment purchases are not securities. Notes that are issued for investments and business acquisitions as well as commercial paper sold outside the normal institutional market are securities. The middle ground has been narrowed, but will still from time to time create a problem. The courts have seen the impact of the open "floodgates" in other areas and should pay heed to the legislative intent and policy considerations discussed above. The federal securities laws are not the appropriate vehicle for consumer protection on installment sales.

*Id.* at 866.

in the enterprise. The impetus for the transaction appears to have come from the borrowers who needed cash to complete the purchase. There is no allegation that the bank solicited the plaintiffs to interest them in an investment. The business enterprise involved was to be operated by the plaintiffs, not by the bank or by the defendants as an investment for the plaintiffs.[16] The complaint was silent as to any of the factors which conceivably might tend to transform an ordinary commercial loan into an investment security.

The third note for $5,000 was an earnest money deposit subsequently redeemed. This note served for a time as a cash substitute. Since the security definition of the 1934 Act "shall not include currency," [17] this document does not confer jurisdiction.

Inasmuch as no securities were involved, this transaction is not subject to the 1934 Act or Rule 10b–5 and the district court correctly concluded that it lacked jurisdiction of the subject matter.

Affirmed.

**16.** Paragraph 18 of the complaint alleged: "Plaintiffs began operating the Village Well on or about January 18, 1972 and continued to operate said business for approximately four months."

**17.** 15 U.S.C. § 78c(a)(10).