**TRI–COUNTY STATE BANK, Individually and on behalf of all other persons and financial institutions similarly situated**

v.

**Saul HERTZ et al.**

**Civ. No. 75–1412.**

United States District Court, M. D. Pennsylvania.

May 20, 1976.

Martin H. Philip, Steven J. Hartz, Palmerton, Pa., for plaintiff.

Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., Allan Ramsay, Jr., Rosenn, Jenkins & Greenwald, Wilkes-Barre, Pa., Stroock & Stroock & Lavan, Cole & Deitz, D'Amato, Colstello & Shea, New York City, for defendants.

## MEMORANDUM AND ORDER

NEALON, District Judge.

This case arises out of certain loan transactions between plaintiff, Tri-County State Bank (Tri-County Bank), a Pennsylvania state bank with its principal office and place of business in Bowmanstown, Pennsylvania, and its customer, Penn Valley Furniture Industries, Inc. (Penn Valley), which, during the period relevant to this suit, was a wholly-owned subsidiary of Drew National Corporation (Drew), a Delaware corporation which is presently the subject of proceedings under Chapter XI of the Bankruptcy Act in the Southern District of New York. The essence of the complaint is that plaintiff was induced, on the basis of false and fraudulent representations regarding the financial position of Drew, to loan Penn Valley $125,000, in return for which plaintiff received promissory notes executed by Penn Valley and secured by Drew's endorsement. The defendants are individual officers and directors of Drew, as well as the accounting firm, together with two of the firm's partners, that prepared financial statements concerning Drew. On the basis of this allegation, the complaint asserts four causes of action, the first for violations of the federal securities laws,[1] jurisdiction over which is predicated on 28 U.S.C. § 1331, and the remaining

---

1. Although the complaint does not specify which provisions of the federal securities laws have allegedly been violated, plaintiffs presumably intend to assert a cause of action under

three for violations of the Business Corporation Law of Pennsylvania, 15 P.S. § 1401 *et seq.*, and the common law of fraud and negligence, jurisdiction over which is based on diversity of citizenship and pendent jurisdiction.

Plaintiff seeks to bring this suit as a class action on behalf of "the hundreds of financial institutions and commercial establishments who from time to time extended loans and credit to the Drew National Corporation or its twenty-two (22) wholly owned subsidiary companies." Complaint, Para. 25. The defendants fall into two classes, (1) individual officers and members of Drew's board of directors, who allegedly conspired to disseminate false and fraudulent financial information regarding Drew, and (2) the accounting firm of Hertz, Herson and Company, together with its co-partners Saul and Ronald Hertz, who are alleged to have participated in the above-described conspiracy and also to have been "negligent, grossly negligent, reckless, wanton, and careless" in the preparation of financial statements and other documents concerning Drew. Complaint, Para. 50.

Presently before the Court is defendants' motion to dismiss the first cause of action on the ground that the promissory notes given to plaintiff by Penn Valley, which are the basis for the cause of action under the federal securities laws, are not securities within the meaning of those laws, because they are commercial paper and not investment securities. In addition, assuming that the motion to dismiss is meritorious and that therefore plaintiff has no cause of

action under the federal securities laws, defendants maintain that service of process on the remaining three counts, which was made pursuant to the nationwide service of process provisions of the federal securities laws, 15 U.S.C. §§ 77v, 78aa, must be set aside for non-compliance with Rule 4(f) of the Federal Rules of Civil Procedure. Plaintiff argues that the promissory notes are securities within the meaning of the federal statutes, and that, in any event, service of process on the non-federal counts was proper because it was in accordance with Pennsylvania's long arm statute. The parties have submitted affidavits and counter-affidavits in support of their positions, together with various exhibits attached to the affidavits. Because the motion to dismiss is for failure to state a claim upon which relief can be granted,[2] and because matters outside the pleadings have been presented to and not excluded by the Court in consideration of the motion, the motion will be treated as for summary judgment and disposed of as provided in Rule 56, Federal Rules of Civil Procedure. *See* Rule 12(b), Federal Rules of Civil Procedure. Summary judgment must be awarded the defendants on court I of the complaint if there is no genuine issue as to any material fact and defendants are entitled to judgment as a matter of law. Rule 56(c).

From the materials submitted by the parties, the following uncontroverted relevant facts appear. Penn Valley and Tri-County Bank have a relationship that antedates the loan transactions which are the basis of this lawsuit. Penn Valley maintained three de-

---

the antifraud provisions of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), as well as under Rule 10b–5 under the 1934 Act, 17 C.F.R. § 240.10b–5. *See* Complaint, Para. 35. The failure to specify the portions of the federal securities laws allegedly violated by defendants is one of the bases for the alternate ground asserted in support of defendants' motion to dismiss, a failure to comply with the requirement of Rule 9(b) of the Federal Rules of Civil Procedure that fraud be pleaded with particularity. Proceedings on the Rule 9(b) portion of the motion to dismiss have been stayed pending disposition of the other grounds offered in support of

the motion, which grounds are the subject of the instant opinion.

**2.** Although defendants term their motion as a motion to dismiss for lack of jurisdiction and for failure to state a claim, *see* Motion to Dismiss and to Set Aside Certain Service, Document No. 14 in the record, the basis of the motion, that the promissory notes are not securities within the meaning of the federal securities laws, goes to whether or not plaintiffs have stated a claim for relief, and not whether this Court has jurisdiction to hear the claim. *See Great Western Bank & Trust v. Kotz*, 532 F.2d 1252 (9th Cir., 1976).

posit accounts with plaintiff bank: a general, a payroll and a petty cash account. Thus, Penn Valley was a customer of the bank prior to the transactions at issue here.

Two separate loans between plaintiff and Penn Valley are the focus of plaintiff's claim that it was induced to loan money to Penn Valley by false and fraudulent representatives as to Drew's financial condition: a $50,000 loan in April, 1971, and a $25,000 loan in March, 1974. When the loans were applied for, Penn Valley informed Tri-County that the proceeds would be used for day-to-day working capital, and that was the use to which the proceeds were put. Both loans were issued on plaintiff's standard promissory note form, were due one day after issuance, and were endorsed by Drew. Payments of principal and interest on the loans were made by regular charges to Penn Valley's general account at the bank, a fixed weekly charge in the case of the larger loan, and a monthly charge for the smaller. The payments on the balance due were made from Penn Valley's own operating capital which had been deposited in its general account.

The April, 1971 loan of $50,000 was initially at an interest rate of 9½ percent. The record shows that it was subsequently increased and renewed several times in varying amounts and at varying interest rates, and that the weekly payments were made regularly until April, 1975. For example, the bank's ledger sheets show that on October 19, 1973, the loan had an outstanding balance of $66,107.84 and was renewed in the amount of $100,000; on February 7, 1974, it had an outstanding balance of $73,727.98 and was renewed in the amount of $100,000; on July 2, 1974, the balance had been reduced to $62,044.90 and was renewed in the amount of $100,000; on December 31, 1974, the balance was $57,-619.72 and was again renewed for $100,000; and by April, 1975, at the time of the last payment, the balance was $68,661.22.

The smaller loan was made at an initial interest rate of 12 percent. It was secured by certain of Penn Valley's inventory and all its equipment and machinery. It was also renewed several times, on each occasion in the amount of $25,000 after the outstanding balance had been substantially reduced by the regular monthly charges to Penn Valley's general account. After the last payment made by Penn Valley, in April, 1975, the outstanding balance was $16,749.

Besides the above facts concerning the transactions between Tri-County Bank and Penn Valley, plaintiff has also sought to introduce into the record facts concerning other loans made to Drew and its subsidiaries other than Penn Valley by banks other than plaintiff bank. In support of these facts, plaintiff has offered the affidavit of Mr. Carl A. Johnson, president of Tri-County Bank, which contains a list of ten banks, together with sums allegedly owed each bank by Drew and/or its subsidiaries; the list is taken from an exhibit, presumably a list of creditors, in Drew's petition in bankruptcy in the Southern District of New York. In addition to the list, Mr. Johnson's affidavit also contains some conclusory allegations regarding Drew's motivation in securing the various loans and the uses to which the proceeds of the loans were put. In essence these allegations are that the loans were part of a common scheme by Drew to raise capital in order to rejuvenate itself and its subsidiaries at a time of financial crisis in its affairs; that the lenders were unaware of the interrelatedness of the loans and of the purpose of the funds to finance Drew's revitalization; and that the entire scheme was "a common enterprise the success of which was totally dependent upon the ability of Drew National Corporation and its various subsidiaries to rejuvenate their business by and through the substantial amounts of money borrowed." Affidavit of Carl A. Johnson at 3.

It seems clear that plaintiff's purpose in advancing these allegations concerning other loans made to Drew and its subsidiaries is to establish that the transactions between it and Penn Valley, which standing alone appear to be ordinary commercial loans by a commercial lending institution to a business in need of working capital, were actually

part of a large financing scheme on the part of defendants to rejuvenate Drew and its subsidiaries through a number of individual bank loans to raise capital in an attempt to continue operation in view of Drew's financial straits. Plaintiff's theory is that it and a number of other creditors of Drew, whom it purports to represent as a class, became unwitting joint participants in a common enterprise, the revitalization of Drew and its subsidiaries, and that the notes issued by Drew and its subsidiaries were the investment vehicle.

At first blush, however, the allegations concerning the purpose and uses of loans other than those made by Tri-County Bank are not credible, if only because the affiant on whose sworn statement the allegations are based, the president of Tri-County Bank, is not in a position to have any knowledge concerning loans made by banks other than his own institution. Plaintiffs have sought to remedy this defect by filing a discovery motion permitting them to contact the other lending institutions and have them file affidavits and/or briefs concerning the circumstances surrounding their loans to Drew and its subsidiaries in support of plaintiff's opposition to the motion to dismiss.[3] Defendants have opposed the discovery motion on the grounds that by it plaintiff is seeking information concerning other members of the class it seeks to represent in the instant class action in order to establish its eligibility to sue in its own right, and that plaintiff must first establish its own right to sue before it may seek to represent other members of a class. *See Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 734 (3d Cir. 1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971). Defendants, however, misperceive the relevance of the information concerning the character of other loans made to Drew and its subsidiaries. Plaintiff does not seek to establish by such information its fitness as a representative of a class, but merely to adduce evidence concerning the loans it made to Penn Valley in order to establish

that those loans were part of a larger scheme by Drew and all its subsidiaries to raise capital to be used to rejuvenate the borrowers. Thus, there is no legal reason why plaintiff should be prevented from obtaining the discovery it seeks. Nevertheless, I do not find it necessary to permit plaintiff to obtain the desired discovery, because, even assuming that by it plaintiff could establish the propositions it has advanced, i. e., that its loans to Penn Valley occurred at a time when Drew and its subsidiaries were engaged in a scheme to raise capital for continued operation by individual loans from commercial lending institutions, under the prevailing law it will still have failed to establish that the promissory notes given by Penn Valley in exchange for the loans were securities within the meaning of the federal securities laws.

An analysis of that prevailing law must begin with the statutory framework. The Securities Act of 1933 and the Securities Exchange Act of 1934 differ slightly in their handling of the kind of notes that are at issue here. The 1933 act provides that "unless the context otherwise requires—(1) The term 'security' means *any note,* stock, treasury stock, bond, debenture . . ." 15 U.S.C. § 77b(1) (emphasis supplied), but exempts from the registration and prospectus requirements "[a]ny note, draft, bill of exchange or banker's acceptance which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." 15 U.S.C. § 77c(a)(3). However, Section 17 of the 1933 Act, the general anti-fraud provision which prohibits fraud in the "offer or sale" of any securities, 15 U.S.C. § 77q(a), provides that the exemptions in 15 U.S.C. § 77c shall be inapplicable to that section.

The 1934 act, on the other hand, defines the term "security" as follows:

---

**3.** A motion seeking permission to obtain such discovery is necessary because of the order of March 12, 1976 by this Court staying all dis-

covery in this case pending resolution of the instant motion.

"When used in this title, unless the context otherwise requires— . . . [t]he term 'security' means any note, stock, treasury stock, bond, debenture . . . or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."

15 U.S.C. § 78c(a)(10).

■ In spite of the slight differences in the language of the two acts defining a security (in the context of notes, the main difference is the reference in the 1933 act, not present in the 1934 act, to "current transactions"), the Supreme Court has termed the definitions "virtually identical," *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), and, for the purposes of this opinion, they will be regarded as the same. The two acts' handling of short-term commercial paper (essentially, notes with a maturity not exceeding nine months), however, is somewhat different. While the 1934 act exempts such paper altogether, the 1933 act only exempts it from its registration and prospectus re-

quirements. It is still subject to the anti-fraud provisions of the 1933 act. Thus, if the acts were applied literally to the notes at issue here, which had a maturity at the time of issuance of one day, only the 1933 act would apply.[4]

It is now well-settled, however, that the federal securities statutes are not to be construed literally in determining what is a security, but are to be applied flexibly in light of Congressional intent, with "form . . . disregarded for substance and the emphasis . . . on economic reality." *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). ". . . Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto." *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975). Under this approach, the sale of shares in a co-operative housing development has been held not to be a security transaction, even though the shares in the development were called "stock," and the securities statutes' definition of a security includes the words "any . . . stock." *Id.*

■ In the case of notes, whether a note is within the acts or exempt turns not on its maturity, as it would under a strict interpretation of the statutes, but on whether the note was issued as commercial or investment paper. *Lino v. City Investing Co.,*

4. Ironically, plaintiff, apparently focusing on the portions of both acts which define a security as "any note," and overlooking the exemptions in both acts, argues that the promissory notes in this case should be regarded as securities under a strict *per se* interpretation of the statutes. However, as has been shown, if the statutes were applied literally, plaintiff would be left only with its asserted cause of action under Section 17 of the 1933 act, and it is by no means clear that there is a private right of action under that section that corresponds to the private right of action under Section 10(b) of the 1934 act and Rule 10b–5, Compare *Dorfman v. First Boston Corporation,* 336 F.Supp. 1089 (E.D.Pa.1972) *with Reid v. Mann,* 381 F.Supp. 525 (N.D.Ill.1974). *See also SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 867 (2d Cir. 1968), *cert. denied sub nom, Coates v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756

(Friendly, J., concurring). *See generally* 3 Loss, Securities Regulation 1785–86 (2d Ed. 1961); 6 Loss, Securities Regulation 3912–15 (Supp.1969). Be that as it may, in spite of some early cases which did construe the statutes strictly in determining what is a security, *see, e. g., Rekant v. Dresser,* 425 F.2d 872, 878 (5th Cir. 1970); *Lehigh Valley Trust Co. v. Central National Bank of Jacksonville,* 409 F.2d 989, 991–993 (5th Cir. 1969), the current and prevailing view, recently endorsed by the Supreme Court, *see United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 848–851, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), is that the statutes should be construed flexibly to effectuate their purpose so that their application will "turn on the economic realities underlying a transaction, and not on the name appended thereto." *Id.* at 849, 95 S.Ct. at 2059. This is the approach followed here. *See infra.*

487 F.2d 689 (3d Cir. 1973); *Bellah v. First National Bank of Hereford, Texas,* 495 F.2d 1109 (5th Cir. 1974); *C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc.,* 508 F.2d 1354 (7th Cir. 1975); *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252 (9th Cir., opinion filed March 22, 1976) reported in Federal Securities Law Reporter, Para. 95,494 at p. 99,496 (1976); *Sanders v. John Nuveen & Co., Inc.,* 463 F.2d 1075 (7th Cir. 1972); *SEC v. Continental Commodities Corp.,* 497 F.2d 516 (5th Cir. 1974). As stated by the court in *McClure v. First National Bank of Lubbock, Texas,* 497 F.2d 490, 494–495 (5th Cir. 1974):

> "On one hand, the Act covers all *investment* notes, no matter how short their maturity, because they are not encompassed by the 'any note' language of the exemption. On the other hand, the Act does not cover any *commercial* notes, no matter how long their maturity, because they fall outside the 'any note' definition of a security. Thus, the investment or commercial nature of a note entirely controls the applicability of the Act . . . ."

Therefore, whether the promissory notes at issue here are securities depends on whether they are commercial or investment paper as those terms have been defined by the courts in determining the application of the federal securities statutes to notes in particular cases.

At the outset, I must address plaintiff's contention that the SEC has conclusively interpreted the exemption for short-term commercial paper as embodying four requirements, all of which must be met before a note may be exempted as commercial paper. The contention is based on SEC Release No. 33–4412, 17 C.F.R. § 231.4412 (1961), in which the Commission elaborated on Section 3(a)(3) of the 1933 act's exemption of short term commercial paper from the registration and prospectus requirements of the statute. The release provides in pertinent part:

> "The legislative history of the Act makes clear that section 3(a)(3) applies only to prime quality negotiable commercial paper of a type not ordinarily purchased by the general public, that is, paper issued to facilitate well-recognized types of current operational business requirements and of a type eligible for discounting by Federal Reserve Banks."

Plaintiff maintains that, because Drew was in a precarious financial position at the time it endorsed the promissory notes under consideration here as evidenced by the subsequent default on the notes, those notes were neither *prime quality* negotiable commercial paper nor of a type eligible for discounting by Federal Reserve Banks and, therefore, do not fall within the commercial paper exemption from the statutes. A similar argument was accepted by the courts in *Sanders v. John Nuveen & Co., Inc.* and *SEC v. Continental Commodities Corp., supra,* as a partial basis at least for findings that the notes at issue in those cases were not commercial paper.

■ The short answer to plaintiff's contention is that Release No. 33–4412 construes the commercial paper exemption from the registration and prospectus requirements of the 1933 act, and does not necessarily apply to the anti-fraud provisions of either the 1933 or the 1934 act. The release seems to have been intended as a guide for prospective issuers by describing generally the type of paper intended to be exempt from registration. It does not purport to establish a rigid, all-inclusive test for determining what is commercial and what is investment paper in the context of an alleged violation of the anti-fraud provisions. Furthermore, application of the release in the manner urged by plaintiff would result in the automatic labeling as "investment" any notes on which an issuer or promisor defaulted, on the conclusory rationale that the default evidences a precarious financial position that precludes the notes being regarded as prime quality or eligible for discounting. That analysis would amount to a determination of the nature of a note at a time subsequent to its issuance, whereas, under the proper procedure, "the nature of an instrument is to be determined at the time of issuance, not at some subsequent time." *Great Western*

*Bank & Trust v. Kotz, supra,* 532 F.2d at 1255, citing *SEC v. United Benefit Life Insurance Co.,* 387 U.S. 202, 211, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967), which in turn was quoting *SEC v. Joiner Leasing Corp.,* 320 U.S. 344, 352–353, 64 S.Ct. 120, 88 L.Ed. 88 (1943). Moreover, such an automatic approach would be contrary to the requirement that the nature of an instrument turn on the economic realities underlying it. If the provisions of the release were applied in the fashion urged by plaintiff, no note on which the issuer or promisor defaulted would be commercial paper, because it would have to be ultimately regarded as neither prime quality nor eligible for discounting. Finally, the courts have agreed that, whatever the relevance of the release to the commercial/investment inquiry, it is not dispositive and does not set forth all the factors that are relevant to determining whether a particular note is commercial or investment. "Rather, it is appropriate and preferable to consider and apply the judicially assessed characteristics ascribed to commercial and investment paper." *SEC v. Continental Commodities Corp.,* 497 F.2d at 525. *See also Bellah v. First National Bank of Hereford, Texas,* 495 F.2d 1109, 1112 n. 3 (5th Cir. 1974). In making the determination, the courts have applied a multi-faceted test that focuses on all aspects of the transaction and instrument in question. As the Court of Appeals for the Third Circuit has advised, "[t]he courts will have to consider the complete context of each transaction in making their determinations." *Lino v. City Investing Co.,* 487 F.2d 689, 696 n. 15 (3d Cir. 1973).

An analysis of some of the cases discloses several of the factors which the courts have identified in determining whether particular notes are commercial or investment. The leading case in this circuit is *Lino v. City Investing Co.,* 487 F.2d 689 (3d Cir. 1973), in which the plaintiff, who had purchased franchise sales center licensing agreements (which gave him exclusive rights to market the seller's programs within certain areas) and made payment with cash and several promissory notes, argued that the promissory notes were securities,

thus creating federal jurisdiction for his claim that he was induced to purchase the agreements by the defendant's material misstatements. In holding that the notes were not securities, the court stated:

> "In no way could City Investing be said to have 'purchased' Lino's notes for speculation or investment. City Investing was selling a certain contract right to Lino, not buying his security. It simply lacks common sense to describe the transaction as City Investing purchasing John Lino's security by paying him the right to operate one of its Franchise Sales Centers."

*Id.* at 695. The court declined to articulate a fixed test for determining in every case whether a promissory note was a security, advising instead that "[t]he courts will have to consider the complete context of each transaction in making their determinations." *Id.* at 696 n. 15.

In *Bellah v. First National Bank of Hereford, Texas,* 495 F.2d 1109 (5th Cir. 1974), the plaintiff issued a six-month promissory note secured by a deed of trust to the defendant bank in return for a loan of funds to be used for the operation of plaintiff's livestock business. When plaintiff defaulted on the note and the bank foreclosed on the property, the plaintiff sued under Rule 10b–5, claiming that at the time of the loan, the bank had promised not to foreclose in the event of default. In holding that the note was not a security because it was part of a commercial not an investment transaction, the court expressly relied on the facts that the bank merely intended to aid the plaintiff in the operation of a business when it extended the funds in return for the note, and that the bank did not seek to profit from the successful operation of the plaintiff's enterprise. *Id.* at 1113. *See also McClure v. First National Bank of Lubbock, Texas,* 497 F.2d 490 (5th Cir. 1974), a case whose fact pattern and holding are essentially identical to *Bellah's,* in which the court set forth digests of most of the cases that have considered whether notes are securities. *Id.* at 493–494. In its analysis of the cases, the court in *McClure* concluded that

". . . where notes have been deemed securities within the meaning of the securities laws, either of two factors, not present here, usually indicated the investment overtones of the underlying transactions. First, in this case, only the Bank and GCD [the borrower] were involved in the execution of documents related to a commercial loan. GCD's notes were neither offered to some class of investors, nor were they acquired by the Bank for speculation or investment . . . Second, in the case at bar, the Bank ostensibly extended its loan so that GCD might pay off its business debt. Thus, GCD did not obtain investment assets, either directly or indirectly, in exchange for its notes."

*Id.* at 493–494.

In *C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc.,* 508 F.2d 1354 (7th Cir. 1975), the court held that promissory notes delivered to a bank for loans used to purchase the assets of a small business enterprise were not securities, with the result that there was no federal jurisdiction for a suit by the maker of the notes seeking recission of the sale on the ground of fraudulent misrepresentations by the sellers as to the value of the business enterprise. The court was influenced by the facts that the impetus for the transaction came from the borrowers who needed cash to complete the purchase; that there was no allegation that the bank solicited the plaintiffs to interest them in an investment; and that the business enterprise involved was to be operated by the plaintiffs, not by the bank or by the defendants-sellers or by the defendants-sellers as an investment for the plaintiffs. In addition, the court set forth several other relevant factors that had been identified in a law review article concerning commercial notes and the definition of a security:

"A comprehensive and perceptive student comment suggests a long list of possible criteria to distinguish ordinary commercial notes not protected by the act from investment notes or investment securities protected by the act: (1) how is the instrument characterized in the business community? (2) how are the proceeds to be used (if for consumer goods or particular business goods or services—not covered, but if for general financing of borrower's enterprise—covered)? (3) extent of reliance on efforts of others (placing funds at great risk, giving note payee extensive collateral rights, making repayment of funds contingent upon some event, all tend to indicate security rather than loan); (4) number of notes issued, number of payees, dollar amount of transaction; (5) payable on demand or if payable at fixed time, how long is the time between issuance and maturity? and (6) characterization of notes on relevant financial statements. Comment, Commercial Notes and Definition of 'Security' Under Securities Exchange Act of 1934: A Note Is a Note Is a Note? 52 Neb.L.Rev. 478, 510–24 (1973)."

*Id.* at 1361.

Finally, in *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252 (9th Cir., 1976), a case virtually indistinguishable from the instant case, the court held that a promissory note of a corporation given to a bank in exchange for a ten-month, renewable line of credit was not a security, thus foreclosing federal jurisdiction for the bank's suit against the corporation's principal for material misrepresentations made in the course of the transaction. The bank had brought suit after the corporation failed to make payments on the note and entered a Chapter X bankruptcy proceeding. The line of credit was in the amount of $1,500,000, and the note had a maturity of 10 months. The transaction was part of a larger plan on the part of the principal to obtain financing for the corporation. A loan agreement which accompanied the note placed stringent limitations on the borrower, *inter alia;* a requirement that the bank's funds be used only for working capital. Following the disclosure of some adverse financial information, but prior to the default on the note, the bank renegotiated the agreement to secure itself with the corporation's personal property and other assets.

■ In concluding that the note was not a security,[5] the court in *Great Western* was influenced by several factors: although the note had a maturity of ten months, it had in effect a much shorter term, as the bank could demand accelerated payment of principal and interest in the event of default; although the note was initially unsecured, the loan agreement required maintenance of a checking account balance of at least $300,000, a readily attachable asset which was tantamount to security; in form, the transaction was commercial rather than investment, characterized as it was by such terms as "borrower," "lender," "loan," and "line of credit"; and because the bank was the only lender involved in the particular transaction at issue in the case, its risk was not interwoven with that of others.

■ Applying the cases and the relevant factors to the promissory notes at issue here, it is clear that they are commercial and not investment paper. With respect to time, "[t]he most important factor[,]" *Great Western Bank & Trust v. Kotz, supra,* 532 F.2d 1252, the notes were in effect demand notes, being due one day from the date of issuance. This kept the bank's risk to a minimum, inasmuch as full payment of principal and interest could be demanded at the first sign of insolvency or financial difficulty on the part of Penn Valley. Furthermore, the proceeds of the loans were to be used for working capital by Penn Valley, not for any capital expenditure or by an entity other than Penn Valley. The loans arose out of an already existing customer relationship between the bank and Penn Valley, and their impetus came from the borrower, which was seeking funds for working capital. In form the loans had all the indicia of commercial transactions—the notes were issued on the bank's own standard promissory note forms; the transaction was referred to as a loan; and payments made on the loan by Penn Valley were referred to as principal and interest payments. The second loan was a secured transaction, and, although the first loan was not secured, it was in effect collateralized by Penn Valley's pre-existing customer relationship with Tri-County, as a result of which Penn Valley maintained three accounts at the bank, and by the require-

5. The court framed its inquiry differently than most other courts in determining whether a note is a security. Instead of simply analyzing the transaction to determine whether it was commercial or investment in nature, the court analyzed "the nature and degree of risk accompanying the transaction to the party providing the funds . . . [in order to determine] whether the funding party invested 'risk capital.'" 532 F.2d at 1256. The risk capital analysis is apparently the approach followed in the Ninth Circuit. *See El Khadem v. Equity Securities Corp.,* 494 F.2d 1224 (9th Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974). Under that approach, "an instrument is generally a security if anticipated return on the funds provided depends largely upon 'the undeniably significant . . . essential managerial efforts' of those other than the funding parties." *Great Western Bank & Trust v. Kotz, supra,* 532 F.2d at 1259, quoting *SEC v. Glenn Turner Enterprises, Inc.,* 474 F.2d 476, 482 (9th Cir. 1973). The Supreme Court recently reserved judgment on the appropriateness of the risk capital approach. *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 857 n. 24, 95 S.Ct. 2051, 44 L.Ed.2d 621. Furthermore, it has not been adopted by the Court of Appeals of this circuit, and does not appear to have been adopted by any other circuit. Neverthe-

less, in spite of the focus of the *Great Western* case on the risk capital question, instead of on the more general commercial/investment inquiry, it is still relevant to the instant case, if only because risk capital analysis is not significantly different from the more general approach. All the factors considered by the court in *Great Western* in determining whether the bank had invested risk capital, *see infra,* are relevant to the instant inquiry. Furthermore, the court in *Great Western* acknowledged that the significant distinction in its case was that between commercial and investment paper. "In the context of this case we must distinguish between the 'risky loan' and 'risk capital.' . . . This distinction has been framed by the courts of appeals as the 'commercial-investment dichotomy.'" *Great Western Bank & Trust v. Kotz, supra,* 532 F.2d at 1257. In addition, the extent to which a return on funds depends on the managerial efforts of those other than the funding parties has been identified by other authorities as one of the factors relevant to distinguishing between commercial and investment paper. *See C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc.,* 508 F.2d 1354, 1361 (7th Cir. 1975). Finally, the notes in this case are not securities under either approach. *See infra.*

ment that payments of principal and interest on the loan be made by regular monthly charges to Penn Valley's general account. The notes had a fixed rate of interest, which meant that the bank's return on the loans did not depend on the amount of profits earned by Penn Valley's business. In sum, the promissory notes at issue here have all the earmarks of commercial paper.

■ Moreover, even if the inquiry is made in terms of risk capital analysis, *see* note 5 *supra,* the result is the same. The bank's anticipated return on the funds loaned to Penn Valley did not depend on the managerial efforts of Penn Valley, but was ensured by the nature of the instruments themselves. Because they were such short term notes, the bank could demand full payment on them at the first sign of financial difficulty on the part of Penn Valley. One of the notes was secured by an interest in Penn Valley's inventory, equipment and machinery, and the other note was, in effect, collateralized. *See supra.* And the bank's return on the notes was established by the fixed rate of interest; it did not depend on the profitability of Penn Valley's business. Although the bank did not realize its full return on the loans as a result of Penn Valley's default, that does not compel the conclusion that the bank invested risk capital in the enterprise. The "risky loan" must be distinguished from an investment of "risk capital." *Great Western Bank & Trust v. Kotz, supra,* 532 F.2d 1252, *citing Motel Co. v. Commissioner,* 340 F.2d 445, 446 (2d Cir. 1965).

■ Plaintiff's contention that its loans to Penn Valley were merely two of several loans to Drew and its subsidiaries that, considered together, must be regarded as a scheme to finance the rejuvenation of a financially troubled enterprise, does not stand up in light of the uncontroverted facts in this case. Assuming arguendo that the loans to Penn Valley occurred at a time when Drew and its subsidiaries were engaged in a scheme to raise revitalization capital by obtaining loans from commercial lending institutions, the loans at issue here were not part of such an interrelated scheme. It is undisputed that the loans were made to supply Penn Valley with working capital. Payments on the loans were made from Penn Valley's own operating capital which had been deposited in its general account at the bank. The first loan was carried for four years in this manner before Penn Valley defaulted on it. During this time the balance fluctuated as monthly payments were regularly made by charges to Penn Valley's general account at the bank, and the loan was renewed on several occasions. The second loan was carried in the same manner for approximately 13 months prior to default. In light of these facts, it cannot seriously be contended that the loans to Penn Valley were part of an interrelated scheme to finance entities other than Penn Valley itself. There is no indication that the proceeds of the loans were used by any entity other than Penn Valley, or for any purpose other than working capital; and it is undisputed that all the payments on the loans were made from Penn Valley's own operating capital. Under these circumstances, I must agree with the court in *Great Western Bank & Trust v. Kotz, supra,* 532 F.2d at 1259, where it stated, in rejecting an argument almost identical to that made by plaintiff in this case:

> "Accepting as true GWB's assertion that its loan was but one of many sought by Artko scarcely supports the conclusion that Artko was making the equivalent of a 'public offering' resulting in investor risk-pooling. An individual business such as Artko may often solicit funds from numerous financial institutions at the same time. Yet where, as here, a disputed transaction is individually negotiated to suit the needs of both contracting parties, it cannot be seriously argued that the lender has pooled its 'investment' with those of other institutions."

In short, at issue in this case is a normal commercial loan transaction between a bank and a corporation interested in obtaining funds for working capital. Pointing to

other loans negotiated by the borrower's parent at the same time and invoking the talismanic term "venture capital" does not change such a transaction into an investment and does not transform promissory notes issued as part of the transaction into securities. In sum, for the reasons stated, summary judgment must be awarded the defendants insofar as plaintiff seeks to establish a violation of the federal securities laws.

 It remains to be considered whether the other counts in the complaint must be dismissed for improper service of process. Service on most of the defendants was made by delivering copies of the summons and complaint upon persons in charge of the offices in which they work in New York City. Two of the defendants were personally served in New York City. Because service was thus made outside the territorial limits of Pennsylvania, it must have been in accordance with Rule 4(f), Federal Rules of Civil Procedure in order to be valid. Rule 4(f) provides that service beyond the territorial limits of the state in which the district court is located must be "authorized by a statute of the United States or by these rules" in order to be valid. Because there is no federal statute on which plaintiff may rely for extraterritorial service in light of the holding, *supra*, that the promissory notes are not securities within the meaning of the federal securities laws, plaintiff must point to some other provision in the federal rules to validate the extraterritorial service in this case.

Plaintiff must rely on Rule 4(d)(7), which provides in pertinent part that service on an individual is sufficient if "the summons and complaint are served . . . in the manner prescribed by the law of the state in which the district court is held for the service of summons or other like process upon any such defendant in an action brought in the courts of general jurisdiction of that state." Thus plaintiff must rely, as it acknowledges in its opposition to the motion to dismiss, on Pennsylvania's long-arm statute.

The manner of service under that statute is set forth in 42 Pa.C.S.A. § 8307, which provides in pertinent part:

"Process directed to persons under this chapter shall be served, by the officer to whom such process shall be directed, upon the Department of State, by sending by registered or certified mail, postage prepaid, a true and attested copy of such process, with the fee required by law, and by sending to the defendant, by registered or certified mail, postage prepaid, a true and attested copy thereof, with an endorsement thereon of the service upon the Department of State, addressed to such defendant at his last known address."

Without deciding whether service of process in this case was otherwise proper under Section 8307, and without deciding whether the defendants are subject to the *in personam* jurisdiction of this court, it is clear that service of process was improper here, if only because a copy of the summons and complaint was not sent by registered or certified mail to the Department of State in Pennsylvania. ". . . [F]ailure to follow the procedures prescribed by statute will make the process on which suit is predicated fatally defective." *Pittman v. Compton*, 277 F.Supp. 772, 773 (N.D.Okl.1968). *Cf. Bookout v. Beck*, 354 F.2d 823, 824 (9th Cir. 1965) (*dictum*) *see also California Clippers, Inc. v. United States Soccer Football Association*, 314 F.Supp. 1057, 1061–1062 (N.D.Cal.1970). For that reason, service must be quashed and the case dismissed. Rule 12(b)(5), Federal Rules of Civil Procedure.