UNITED CALIFORNIA BANK, a California Corporation, Plaintiff-Appellee,

v.

THC FINANCIAL CORP., a Hawaii Corporation, Defendant-Appellant.

UNITED CALIFORNIA BANK, a California Corporation, Plaintiff-Appellant,

v.

THC FINANCIAL CORP., a Hawaii Corporation, Defendant-Appellant.

Nos. 75–1811, 75–2733.

United States Court of Appeals, Ninth Circuit.

July 25, 1977.

Terence J. O'Toole, Carlsmith, Carlsmith, Wichman & Case, Honolulu, Hawaii, argued, for defendant-appellant.

John A. Hoskins, Anthony, Hoddick, Reinwald & O'Connor, Honolulu, Hawaii, argued, for plaintiff-appellee.

Before ELY, WRIGHT and KENNEDY, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

This breach of contract suit against The Hawaii Company Financial Corp. (THCF) by United California Bank (UCB) arises from THCF's refusal to purchase $500,000 of Climate Company's (Climate) promissory notes from UCB upon demand pursuant to a "put letter" of July 2, 1973.[1]

Under the terms of the put letter UCB was to extend a $500,000 line of credit to Climate for six months conditioned on THCF's agreement to buy from UCB on demand all notes given by Climate to secure the advances. THCF would take an assignment of all Climate of Hawaii accounts receivable to secure its position. THCF admits nonperformance but asserts the contract is unenforceable because UCB violated its duties of disclosure under the federal securities laws[2] and California guaranty law.[3]

At the conclusion of a jury trial the court directed a verdict for UCB and denied the motion of THCF for a directed verdict. This followed (a) the trial judge's reversal of his pretrial ruling that the Climate note was a "security" and (b) his conclusion that the July 2 put letter was not a guaranty.

Failure to sustain either defense made the directed verdict ineluctable. Thereafter, judgment was entered in favor of UCB for the amount of the note, together with certain prejudgment interest and costs ($566,045.73). THCF appeals from the directed verdict and judgment in favor of UCB. UCB cross-appeals from the denial of prejudgment interest at a rate of 2.75% over commercial prime plus some travel expenses and attorneys' fees.

FACTS

The principal interests in this case are: UCB, a full-service California bank; THCF, a Hawaiian financial thrift company; and the Climate Company (also known as Hardeman Engineers), a California and Hawaiian subcontracting enterprise in the air conditioning, plumbing and heating business.

UCB was Climate's principal lender for its California operations under two lines of credit totalling $1,350,000.[4] None of Climate's Hawaiian operations was financed by UCB and its financing needs were handled primarily by the First Hawaiian Bank through a receivables line of credit.

---

1. The terms of the put letter were in a memorandum of July 2, 1973, from Thomas S. Abel, Jr., President of THCF, to Frank Bristow, Vice-Chairman of UCB:

"This letter will confirm our conversation of this morning that THC Financial Corp. will agree to purchase for a period of six months from date hereof all notes taken by you to secure advances under a $500,000 lines of credit to Paul Hardeman Engineers and Constructors, Inc. [Climate].

"We will take an assignment of all Hawaii receivables to secure our commitment to purchase these notes from you if demand is made. In the event demand is made, we shall agree to fund the balance of the line or $500,000 plus accrued interest whichever is the lesser within five working days from date of demand. You in turn will endorse these notes to the order of THC Financial Corp. without recourse.

"If the above meets with your approval, please so acknowledge on the copy of this letter attached and return to us."

2. Appellant seeks relief under §§ 12(2) [15 U.S.C. § 77*l*(2)] and 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)]; § 10(b) of the Exchange Act of 1934 [15 U.S.C. § 78j(b)] and S.E.C. Rule 10b–5 [17 C.F.R. § 240.10b–5 (1976)].

3. Cal.Civ. § 2787.

4. The first line permitted a $900,000 ceiling as part of UCB's Specialty Contractors' Financing Program (SCFP). The second line was a $450,000 credit extended through the bank's job equity program. The two lines were related by UCB's requirement that the equities securing the job equity line directly relate to SCFP financial contracts.

By July 1, 1973, Climate owed UCB approximately $729,000 under its lines of credit and suffered from dire cash flow problems. It was in default on two UCB notes for $172,000 and the bank feared other repayments were threatened by Climate's excessive leveraging. In fact, UCB would not lend Climate an additional $500,000 it required to meet current operating expenses nor would the bank extend credit against Climate's Hawaiian accounts receivable. UCB suggested to Climate that it find a new lender.

On July 1, 1973, Roy Loftin, Chairman of Climate's Board, met with Nicholas Wallner, President of THCF's parent corporation, The Hawaii Company (THC), without UCB's knowledge. In discussing Climate's desperate need for working capital, Wallner suggested a "put-type arrangement" with THCF using Climate's Hawaiian accounts receivable as its security interest. THCF rejected the possibility of a loan or guaranty arrangement.

On the evening of July 1, Wallner (THCF) telephoned H. V. Grice, Vice-Chairman of UCB, to discuss Loftin's reputation in the financial community and the possibility of a put-type arrangement. THCF contends that UCB failed to disclose during this conversation or subsequently: (1) Climate's default on the two notes; (2) UCB's unwillingness to finance Climate further; (3) Climate's cash flow problems; and (4) Climate's decreasing work load and diminishing scale of operations.

UCB counters by pointing to testimony that Grice (UCB) told Wallner (THCF) he assumed Wallner knew "that Climate's condition was they were tight for cash; that they were extended." Wallner (THC) then called Thomas S. Abel, Jr., the new President of THCF, to report on his conversation with UCB's Grice.

On July 2, Loftin (Climate) spoke with Abel about the put letter proposal. At Abel's request Climate provided THCF with "financials and aging of accounts receivable, summary of work in progress, and various statements." Abel and other THCF officers responsible for approving the deal reviewed Climate's financial information. After this review the parties agreed on a put letter proposal to UCB wherein THCF would receive five points ($25,000) on the transaction.

Abel obtained UCB approval later that day through a telephone conversation with Frank Bristow, UCB Vice President in charge of its Construction Industries Division. UCB immediately lent Climate $75,000 on July 2.

During the following two weeks UCB made three more loans to Climate of $150,000 (7/12), $75,000 (7/18) and $200,000 (7/19) under the letter agreement. About $22,000 of the last loan was retained by UCB as repayment on one of Climate's defaulted notes. THCF was not notified of these advances.

THCF asserts that during this period UCB failed to disclose to THCF the bank's refusal to fund four new Climate construction projects. UCB avers that in July 1973 Climate's Loftin told UCB's Bristow that Climate had a new bank to finance its California operations and accordingly UCB declined to finance the four new jobs.

Upon Climate's failure to repay the loans on August 31 as contemplated, they were consolidated and several renewals were granted by UCB. On October 29, 1973, UCB made demand upon THCF to purchase Note 442, the September renewal. THCF refused. Climate filed a Chapter XI petition on November 15 and UCB brought this action on December 5, 1973.

## DISCUSSION

### I. *THCF's APPEAL*

#### A. *Standard for a Directed Verdict.*

■ In *Great Western Bank & Trust v. Kotz*, 532 F.2d 1252, 1255 (9th Cir. 1976), we reiterated that "in appropriate circumstances a properly instructed jury can determine whether as a matter of fact a disputed instrument is or is not a 'security.' *S. E. C. v. C. M. Joiner Leasing Corp.*, 320 U.S. 344,

351 [64 S.Ct. 120, 88 L.Ed. 88] (1943); *Tarvestad v. United States* [8 Cir.,] 418 F.2d 1043, 1048 (1969)." The same reasoning applies also to the question whether an instrument is or is not a guaranty.

■ The issue, therefore, is whether UCB is entitled to prevail as a matter of law. The test for determining whether the motion for a directed verdict was properly granted is "whether or not, viewing the evidence as a whole, 'there is substantial evidence present that could support a finding, by reasonable jurors, for the nonmoving party.' " [5] *Quichocho v. Kelvinator Corp.*, 546 F.2d 812, 813 (9th Cir. 1976), *quoting Chisholm Bros. Farm Equipment Co. v. International Harvester Co.*, 498 F.2d 1137, 1140 (9th Cir.), *cert. denied*, 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974). *See generally Continental Ore v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Brady v. Southern Ry.*, 320 U.S. 476, 479–80, 64 S.Ct. 232, 88 L.Ed. 239 (1943).

■ A directed verdict for the plaintiff presents an exceptional case and is sustainable only if the evidence "was such that the court could say that as a matter of law the evidence was capable of only one interpretation and that in favor of liability." *Juhnke v. EIG Corp.*, 444 F.2d 1323, 1325 (9th Cir. 1971).

■ A plaintiff's motion for a directed verdict requires the trial court to test the body of evidence not for its insufficiency to support a finding, but rather for its overwhelming effect.[6] *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3rd Cir. 1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977).

### B. *"Security" Issue.*

■ Section 3(a) of the Exchange Act of 1934 provides, in pertinent part:

When used in this title, *unless the context otherwise requires—*

(10) The term 'security' means any note . . . investment contract . . . or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing . . . .

15 U.S.C. § 78c(a)(10) (Emphasis added.)

The definition in § 2(1) of the 1933 Act [15 U.S.C. § 77b(1)] is slightly different. The two definitions, however, are considered functional equivalents. *See, e. g.,* S.Rep.No. 792, 73d Cong., 2d Sess. 14 (1934) ("substantially the same"); *Tcherepnin v. Knight*, 389 U.S. 332, 336, 342, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

■ In *Kotz, supra,* 532 F.2d at 1255–56, we reviewed the trend toward making the definitional test for both investment contracts and other types of securities dependent on the substance and economic realities of the transaction. The contextual standard remains the most widely shared approach and often focuses almost exclusively on those characteristics which distinguish

---

5. A more elaborate formulation of the standard is provided by the Fifth Circuit, *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (1969) (*en banc*):

"If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion [for a directed verdict] is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded [persons] in the exercise of impartial judgment might reach different conclusions, the motions should be denied, . . . . A mere scintilla . . . is insufficient . . . ."

6. *See also Miller v. N. Y. Produce Exch.,* 550 F.2d 762, 767 (2d Cir. 1977) ("[if] reasonable men can reach only one conclusion"); *Eckles v. Sharman*, 548 F.2d 905, 909 (10th Cir. 1977) ("evidence all points one way"); *Service Auto Supply of Puerto Rico v. Harte & Co.*, 533 F.2d 23, 24–25 (1st Cir. 1976) (established by "testimony that the jury is not at liberty to disbelieve"); *Wilson v. United States*, 530 F.2d 772, 776–77 (8th Cir. 1976) ("only where evidence points *all one way* and is susceptible of no reasonable inferences sustaining the position of the nonmoving party.") *See generally* 5A J. Moore, Federal Practice, ¶ 50.02[1] at 2318–19 (2d ed. 1975).

"investment" from "commercial" transactions.[7]

[ ] The Supreme Court most recently dealt with the term "security" in *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). It held that purchasers' shares of "stock" entitling them to lease an apartment in a nonprofit housing cooperative were not "securities" under the federal securities laws. The Court rejected a literal approach[8] and adopted the economic realities test, *id.* at 849, 95 S.Ct. at 2059, which looks to "the economic realities underlying a transaction and not [to] the name appended thereto." *Id.; accord Tcherepnin, supra,* 389 U.S. at 336, 88 S.Ct. 548.

Applying this test, none of the usual characteristics of stock was found to be associated with the shares. For example, the shares carried no rights to dividends; they were non-negotiable; the shares could not be hypothecated; the instrument conferred no voting rights proportionate to the number of shares owned and they could not appreciate in value. The Court, therefore, concluded that the purchaser's intent was to obtain housing rather than to make an investment for profit. *Forman,* 421 U.S. at 852–53, 95 S.Ct. 2051.

The Court then considered whether the shares were "investment contracts" under the *Howey* test. In *S.E.C. v. W. J. Howey,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 90 L.Ed.

7. *See, e. g., C. N. S. Enterprises, Inc. v. G. & G. Enterprises, Inc.,* 508 F.2d 1354 (7th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); *Zabriskie v. Lewis,* 507 F.2d 546 (10th Cir. 1974); *SEC v. Continental Commodities Corp.,* 497 F.2d 516 (5th Cir. 1974); *Lino v. City Investing Co.,* 487 F.2d 689 (3rd Cir. 1973); *McClure v. First Nat'l Bank,* 497 F.2d 490 (5th Cir. 1974); *Bellah v. First Nat'l Bank,* 495 F.2d 1109 (5th Cir. 1974); *Avenue State Bank v. Tourtelot,* 379 F.Supp. 250 (D.C.Ill.1974).

The Second Circuit reviewed extant tests exhaustively in *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126 (2d Cir. 1976). Judge Friendly questioned the previously unquestioned assumption that the phrase "unless the context otherwise requires" means the context of the federal securities laws and not the context of the transaction and not the context of the federal securities laws. *Id.* at 1137–1138. *See also* Pollock, Notes Issued in Syndicated Loans—A New Test to Define Securities, 32 Bus.Law. 537 (1977).

The Second Circuit now places the burden on the one asserting that the statute's plain terms do not apply to demonstrate that the "context otherwise *requires.*" The court held that Touche Ross failed to meet this burden and the three notes at issue were considered to be securities.

Other recent cases include: *State Mutual Life Assurance Co. of Amer. v. Arthur Andersen & Co.,* 63 F.R.D. 389 (S.D.N.Y.1977); *Mallinckrodt Chemical Wks. v. Goldman, Sachs & Co.,* 58 F.R.D. 348 (S.D.N.Y.1976); *Lincoln Nat'l Bank v. Lampe,* 414 F.Supp. 1270 (N.D.Ill. 1976); *NBI Mortgage Investment Corp. v. Chemical Bank,* CCH. Fed.Sec.Rep. ¶ 95,632 (S.D.N.Y.1976); *Tri-County State Bank v. Hertz,* 418 F.Supp. 332 (M.D.Pa.1976).

*See generally* Comment, Commercial Notes and Definition of "Security" under Securities

Exchange Act of 1934: A Note is a Note is a Note?, 52 Neb.L.Rev. 478 (1973); Lipton & Katz, "Notes" Are Not Always Securities, 30 Bus.Law. 763 (1975).

8. *Forman, supra,* 421 U.S. at 849, 95 S.Ct. 2051.

Cases prior to 1971 generally employed a variant of Frankfurter's "plain meaning" construction, [Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527 (1947)] and held that when the statute read "'security' means *any* note . . ." it meant just that. *See, e. g., Movielab, Inc. v. Berkey Photo, Inc.,* 321 F.Supp. 806 (S.D.N.Y. 1970), *aff'd,* 452 F.2d 662 (2d Cir. 1971); *Rekant v. Desser,* 425 F.2d 872, 878 (5th Cir. 1970).

Appellants rely heavily on one such case, *Lehigh Valley Trust Co. v. Central Nat'l Bank,* 409 F.2d 989 (5th Cir. 1969). It is one of the few cases involving a multiparty loan participation. Most are two-party loan transactions. In *Lehigh Valley Trust* the Trust brought a Rule 10b–5 action for misstatements and omissions in connection with the sale to it of a participation in a loan originated by Central Bank and evidenced by a promissory note given by Larso Development Company. The Fifth Circuit held that the participation in the note given by Larso to the bank and later purchased by the Trust was a security based on a literal reading of the statute. 409 F.2d, at 991–02.

Although such literal constructions since have been rejected by the Court and the Fifth Circuit, this case remains vital by instructing that, while the underlying note may not be a security, the participation interest may fall within the definition of a security. *Cf. Avenue State Bank v. Tourtelot,* 379 F.Supp. 250, 254 (N.D.Ill.1974).

1244 (1946), a three-pronged test for investment contracts was articulated. There must be (1) an investment of money, (2) in a common enterprise and (3) an expectation of profits from the managerial efforts of others. The Court, in *Forman*, concluded the third prong of the *Howey* standard was not met because the shareholders did not expect to realize a profit from the entrepreneurial efforts of others.

■ The combination of "economic realities" standard plus the Court's emphasis on an expectation of profits from the entrepreneurial efforts of others are encompassed in this circuit's "risk capital" test.[9] *Kotz, supra,* 532 F.2d at 1256–58.

Under the risk capital standard the ultimate question is whether the funding party "contributed 'risk capital' subject to the 'entrepreneurial or managerial efforts' of [others]." *Id.* at 1257. *See also El Khadem v. Equity Securities Corp.,* 494 F.2d 1224 (9th Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974); *Hector v. Wiens,* 533 F.2d 429 (9th Cir. 1976); *S.E.C. v. Glenn W. Turner Enterprises,* 474 F.2d 476 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). For example, participations or notes evidencing "risk capital," *i. e.,* risk of nonpayment, are securities while those evidencing "risky loans" are not.

■ In *Kotz,* we listed six factors, none determinative, to measure the risk involved. These include: (1) time; (2) collateralization; (3) form of the obligation; (4) circumstances of issuance; (5) relationship between the amount borrowed and the size of the borrower's business; and (6) the contemplated use of the funds. *Kotz, supra,* 532 F.2d at 1257–58. Applying these factors, in light of the circumstances surrounding the transactions of this case, we conclude as a matter of law that the put letter agreement and the notes were not "securities" under the federal securities laws.

THCF perceived the totality of the deal as low risk and approached it as an experienced financial enterprise. THCF's Abel requested, and Climate provided, certain financial information about Climate and its Hawaiian operations. This information was reviewed by Abel and the other THCF officers responsible for approving the transaction before the issuance of the put letter.

Q. . . . After receiving that information, did you satisfy yourself as a banker here in Hawaii that the financial situation of Climate of Hawaii and their receivables was satisfactory?

A. Yes. As I recall, there was one receivable of $37,000 out of nearly $2 million that was from a company that was in trouble. The rest were all the larger companies in Hawaii.

Testimony of Abel, R.T. 627.

Grice (UCB) further told Wallner (THCF) that Climate was "tight for cash" and "extended." This is not the situation where an unsophisticated investor lacked access to inside financial information. It is not even a syndicated multi-bank loan participation where even a sophisticated investor may lack access to crucial information. As THCF's Wallner testified, he recommended the loan to Abel "because of our knowledge of Climate of Hawaii." Although not determinative, the context of this transaction is revealing; it has all the earmarks of a commercial lending situation.

Other indicia support our conclusion. As a rule of thumb the longer the time money

9. The "risk capital" standard first was employed by the California Supreme Court, *Silver Hills Country Club v. Sobieski,* 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961). It since has been adopted in Hawaii and Oregon. *See State of Hawaii v. Hawaii Market Center, Inc.,* 52 Haw. 642, 485 P.2d 105 (1971); *Oregon ex rel. Healy v. Consumer Bus. Sys.,* 5 Or.App. 19, 482 P.2d 549 (1971). *See generally* Coffey, The

Economic Realities of a 'Security': Is There a More Meaningful Formula?, 18 Case W.Res.L. Rev. 367 (1967).

The explicit use of criteria concerning "risk" as a means to define a "security" can be found at least as early as the 1930's. *See, e. g., Brownie Oil Co. of Wisconsin v. Railroad Comm'n of Wisconsin,* 207 Wis. 88, 240 N.W. 827, 829 (1932).

is used the greater the risk of loss. The notes underlying the put letter had only a one-month maturity and the put letter conditioned any demand for purchase within a six-month period. Although the loans were renewed several times, there appears to have been no expectation of indefinite extensions or continual roll-overs.

The testimony and the terms of the put letter also disclose that THCF planned to use the security interest in Climate's Hawaiian accounts receivable as collateral and believed the risk associated with the Hawaiian receivables was low. As was the case in *Kotz*, the risk accompanying the notes was limited to the risk associated with lending any money for a period of time. 532 F.2d at 1259.

The put letter and notes were not part of a multi-bank loan participation or a public offering. The notes and put letter were tailored to meet the needs of the contracting parties with the expectation that the notes might be sold only to THCF.

The "economic realities" underlying this transaction are apparent from the intended use of the funds. Climate needed the money to maintain its current financial position by meeting the company's current working capital obligations including its payroll.

The absence of risk capital is further shown by the fact that the notes carried an interest rate of 2.75% over commercial prime which certainly suggests an intent to consummate a commercial lending arrangement. *See, e. g., State Mutual Life Assurance Co. of America v. Arthur Andersen & Co.*, 63 F.R.D. 389 (S.D.N.Y.1977). THCF intended to rewrite any third party notes it was forced to purchase from UCB at an 18% rate. Officers of THCF testified they wished to assist Climate with developing a new Hawaiian banking relationship and to put their accounts receivable and other balance sheet items on an even keel. Each factor, then, points to the lack of "risk capital" as contemplated in *Kotz*.

The notes were short term, payable only to payee, payable upon demand and limited in their distribution. In sum, there are none of the usual indicia of a package of rights or "piece of the action" which underlie almost all securities. *See, e. g.,* Sobieski, What is a Security?, 25 Mercer L.Rev. 381 (1974).

Viewing the facts in the light most favorable to THCF, as we must, the conclusion is inescapable that it was a sophisticated financial enterprise. THCF decided after completing its own credit investigation to enter into a commercial lending arrangement which it thought was relatively risk free and, in the light of hindsight, was not. An error in business judgment rather than a lack of disclosure by UCB better explains THCF's predicament. As the court in *Lincoln Nat'l Bank v. Lampe*, 414 F.Supp. 1270 (N.D.Ill.1976), noted, the fact "that this [transaction] proved to be unduly risky and ill-advised does not in itself convert it into a speculative investment."

### C. *"Guaranty" Issue.*

Appellant contends that under California law THCF was a guarantor or surety on Climate's obligation to UCB. THCF asserts the intent of the put letter agreement was to promise to answer for the debt of another upon default because, under the circumstances, UCB would demand purchase of the Climate notes only if Climate defaulted.

*Union Bank v. Winnebago Indus., Inc.*, 528 F.2d 95 (9th Cir. 1975), illuminates the reasons there was no guaranty or surety here. *Union Bank* also involved a tripartite financing arrangement and an interpretation of California guaranty law.

Winnebago, as franchisor, executed a repurchase agreement in favor of the bank in connection with a "flooring" arrangement by its franchisee. Under this agreement the franchisee would finance its inventory purchases through an extension of credit from the bank, the flooring arrangement. Under the terms of the agreement, Winnebago promised to repurchase vehicles from the financial institution at a specified price

if the dealer defaulted in his repayment to the bank.

Winnebago defended a breach of contract suit by arguing it was a guarantor or surety and, therefore, certain beneficial legal defenses were available. We affirmed the district court's determination that the contract was simply a promise to repurchase upon the dealer's default.

Additionally, the dealer's default in *Union Bank* clearly was a condition precedent to Winnebago's duty to repurchase, yet the court held there was no guaranty. Here there was no requirement of a default as the triggering mechanism for the purchase of the notes.

THCF now asserts, as Winnebago argued unsuccessfully:

[a] prior unilateral and private intention to become a guarantor. This attempt is foreclosed, in the absence of fraud or mistake, because the subjective, unexpressed and uncommunicated thoughts of a party are irrelevant to the material issue of the parties' intent [California citations omitted].

*Id.* at 99.

 Other factors found persuasive in *Union Bank* are pertinent. First, the interpretation of a written instrument, whether or not a surety contract, rests solely in the province of the court unless it is ambiguous. *See, e. g., Parsons v. Bristol Development Co.,* 62 Cal.2d 861, 865, 44 Cal.Rptr. 767, 402 P.2d 839 (1965). Here, the terms of the agreement make the parties' duties clear and "bear no intimation of any guaranty or surety relationship." *Union Bank, supra,* 528 F.2d at 98.

 Second, only if the agreement were thought to be ambiguous would contextual evidence be appropriate to prove the meaning of certain terms or the parties' intent. *Pacific Gas & Electric Co. v. G. W. Thomas Drayage & Rigging Co., Inc.,* 69 Cal.2d 33, 37, 40, 69 Cal.Rptr. 561, 564, 566, 442 P.2d 641, 644, 646 (1968).

Even if we assume ambiguity, the tripartite financing arrangement at issue does not make a guarantor-guarantee construction "reasonably susceptible." *Union Bank, supra,* 528 F.2d at 98.

 Common business usage is a favored type of extrinsic evidence used to show intent or clarify the meaning of terms. *Pacific Gas & Electric Co., supra,* 69 Cal.Rptr. at 565, 442 P.2d at 645. Testimony at trial disclosed the put letter arrangements were not considered guaranty or surety relationships in the financial community.

Extrinsic evidence of the contractual context also reveals that Climate requested a guaranty arrangement by THCF but THCF rejected this suggestion. Moreover, the terms of the put letter differ significantly from the language usually used by THCF in its guaranty forms.

 California law further requires that the obligations of a guarantor or surety be identical to those of the defaulting principal. They were not identical here. *Wiener v. Van Winkle,* 273 Cal.App.2d 774, 78 Cal. Rptr. 761 (1969). That state's law also mandates that the terms of the instrument be strictly construed against THCF, the drafting party. Cal.Civ. Code § 1654. The district court correctly concluded as a matter of law that this transaction did not create a guarantor-guarantee relationship.

Our determination that the instant transaction involved neither securities nor a guaranty undermines THCF's defenses to nonperformance. Its failure to purchase the notes on demand constitutes a breach of contract and the district court so found.

## II. *Cross-Appeal*

### A. *Prejudgment Interest.*

 The rate of interest on the notes was specified at "2.75% over commercial prime per cent per annum from date until paid." UCB made demand upon THCF to purchase $500,000 in notes plus accrued interest.

The district court computed prejudgment interest at the "2.75% above prime" rate for

the period through November 5, 1973 (five days after THCF's refusal to purchase Climate's notes from UCB). It then applied California's statutory seven per cent rate for the period from November 6, 1973 to the entry of judgment.

The difference between the statutory rate and the "2.75% over prime" figure for the post-November 6 period is $41,998.70. UCB argues the court erred in holding that THCF had not agreed to pay interest at the rate specified in the notes given by Climate to UCB. The assertion is that there was a contract rate of interest pegged to the prime rate which governed the entire transaction and not only Climate's notes to UCB.

Both sides point to the California provisions enacting the common law principle that the intent of the parties is to be ascertained from the writing alone, if possible. There is no direct evidence to indicate any intent to incorporate the terms of the Climate-UCB agreement into the entire transaction. The breach of contract suit here is premised on the basis of an alleged breach of the put letter agreement and not an action on the promissory notes. The district court's determination was not clearly erroneous and we affirm its award of prejudgment interest.

#### B. *Travel Expenses for Witnesses.*

UCB contends the trial court erred in disallowing $2,117.20 in statutorily mandated witness fees. The district court has discretion to disallow costs "[e]xcept when express provision therefore is made . . . in a statute of the United States . . .." Rule 54(d), Fed.R.Civ.P. UCB asserts that 28 U.S.C. § 1821 [per diem, travel and subsistence allowances] falls within the ambit of Rule 54(d).

The contested costs are travel and subsistence for four UCB witnesses, three officers and one expert. UCB argues the costs are warranted because the testimony was necessary to the resolution of the case.

The district court's determination may be reversed only for an abuse of discretion.

To be taxable as costs the witnesses' testimony must be material to an issue tried and reasonably necessary to its disposition. *See* 6 J. Moore, Federal Practice, ¶ 54.77[5.–1] at 1731. The trial judge was in a better position to determine whether the testimony met that standard and, in the absence of any showing of an abuse of discretion, we affirm the disallowance.

#### C. *Attorneys' Fees.*

UCB asserts the district court erred in applying the California rule on attorneys' fees and in denying fees. It argues that the law of Hawaii, the forum state [H.R.S. § 607–14], should have been applied.

The argument is meritless. *Alyeska Pipeline Co. v. Wilderness Soc'y,* 421 U.S. 240, 259 n. 31, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Tryforos v. Icarian Dev. Co., S.A.,* 518 F.2d 1258, 1256 (7th Cir. 1975) (Stevens, J.).

AFFIRMED.