769 F.2d 1426
 Fed. Sec. L. Rep. P 92,280, 13 Collier Bankr.Cas.2d 1198,
Bankr. L. Rep. P 70,718
Herbert D. UNDERHILL, et al., Plaintiffs-Appellees,
v.
Carlos ROYAL, et al., Defendants-Appellants.
Herbert D. UNDERHILL, et al., Plaintiffs-Appellants,
v.
NATIONAL MORTGAGE EXCHANGE, INC., et al., Defendants-Appellees.
 Nos. 84-6210, 84-6211.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 4, 1985.
Decided Aug. 29, 1985.
 
 Matthew V. Herron, Meisenheimer & Herron, San Diego, Cal., for plaintiffs-appellees.
 Gregory A. Akers, Akers & Williams, James F. Stiven, San Diego, Cal., for defendants-appellants.
 Appeal from the United States District Court for the Southern District of California.
 Before WALLACE, TANG, and WIGGINS, Circuit Judges.
 TANG, Circuit Judge:
 
 
 1
 California Mortgage Exchange, California Mortgage Exchange of Southern California and the principal shareholder of both companies, Carlos Royal, appeal from a judgment entered against them after a jury trial. These defendants were found liable for violations of federal and state securities laws. The plaintiffs cross-appeal the jury's finding that a director of one of the corporations, Max Hollis, was not derivatively liable for his company's participation in the illegal securities offering. We affirm.
 
 I. BACKGROUND
 
 2
 Carlos Royal, a real estate businessman in Southern California, started a "loan agreement" program in the San Diego area in 1976 after purchasing the loan agreement concept from California Mortgage Exchange, a company in Central California. Previously, the attorney for California Mortgage Exchange had corresponded with the California Department of Corporations in response to Department inquiries regarding the character of the promissory notes sold pursuant to the loan agreement program. The attorney, Erling Kloster, gave the Department his opinion that the notes were not securities. No action was taken by the Department for the company's failure to qualify the program under the state securities laws.
 
 
 3
 Royal started two companies in Escondido, California. National Mortgage Exchange (NME) was formed in 1976 but was not active until early 1979 when it began to establish franchises for a mortgage brokerage business. These franchises would operate under the NME name and use its trademark. The other company started by Royal was National Mortgage Exchange of Southern California (NMESC). That company was also active as a mortgage broker, but also operated the loan agreement program. In 1980, NMESC entered a franchise agreement with NME, allowing use of NME's name and mark as part of its mortgage brokerage business.
 
 
 4
 Under the loan agreement program, NMESC would borrow money from lenders with promise of repayment according to the terms of a "collateral loan agreement/promissory note." The notes would mature in one to three years with a promised return of ten percent above principal. NMESC used the funds to buy at a discount third party promissory notes secured by deeds of trust. The company's beneficial interest in the purchased trust deeds would then be available to secure the obligations owed to the lenders. The lender's money would be placed in a segregated trust account pending the collateral assignment of a security interest in a trust deed owned by NMESC. The lender retained the right to reject the assignment. The program was advertised over radio and through newspapers. NMESC also distributed a brochure outlining the loan agreement plan. The brochure promised an annual return of 10 percent interest on the investment and called it "the Secured Contractual Loan Program of National Mortgage Exchange." The only reference in the brochure to National Mortgage Exchange of Southern California appears at the end of the brochure under the signatures of the Senior Vice President and Vice President of the company. All other references are to National Mortgage Exchange.
 
 
 5
 The plan was designed to restrict sales only to California residents to avoid the registration requirements of the federal securities laws through the intrastate offering exemption. Hundreds of people invested in the plan over a five-year period, however, and some of them were out-of-state residents. Relying on the correspondence between the California Mortgage Exchange attorney and the Department of Corporations, in addition to the inaction of the Department, NMESC did not qualify its sale of the promissory notes with the Department of Corporations. In 1980, however, the Department again raised questions regarding the sales of the notes and requested an explanation for nonqualification of the offering. NMESC's attorney responded that the operation did not involve the sale of securities.
 
 
 6
 When the recession hit hard in 1981, NMESC's cash flow suffered because many of the notes in its portfolio went into default. NMESC filed for Chapter 11 reorganization. The holders of the notes in the loan agreement program were classified as unsecured creditors because their security interests in the notes were deemed unperfected as they lacked actual or constructive possession of the assigned notes or trust deeds. Their claims totaled nearly $4.5 million.
 
 
 7
 After the bankruptcy filing, the Underhills in September, 1981, commenced this action against the defendants for securities law violations. They claimed violations for failure to file a registration statement under federal law and a qualification statement under California law. They also alleged violations of the anti-fraud provisions of state and federal law.
 
 
 8
 In the bankruptcy proceedings, a proposal was made to repay 100 percent of the amounts owing to the unsecured creditors over a five-year period, but the creditors rejected the plan. Royal proposed an alternative method of repayment. He offered to exchange NMESC's notes for property held by a third party financial institution (Central Savings & Loan). The company would then use the property to secure a loan with the loan's proceeds going into the fund to pay off the creditors. Under this plan, the creditors would immediately get 50 percent of their principal returned. Royal also sought to obtain a release from the participants in the loan agreement plan of all claims against the debtor, "any affiliate of the Debtor, and any insider of the debtor." 89 percent of the creditors approved the plan. The Underhills, however, raised objections to the release provision on June 25, 1982. The plan was confirmed by the bankruptcy court on July 7, 1982, but only after a stipulation was entered which left the scope of the release and its enforceability subject to the district court's ruling in the Underhill class action.
 
 
 9
 The plan was executed, but the amount raised to fund the plan fell short of the $2.5 million goal. Royal then obtained a personal loan of $350,000 from Escondido Bank to fund the plan and secured it with his personal assets. The fund was then sufficient to cover the plan.
 
 
 10
 On October 14, 1982, the district court conditionally certified the class for a separate trial on the validity of the release contained in the reorganization plan. The class was certified as 295 investors in the loan agreement program. Subsequently, the plaintiffs moved for summary judgment on the validity of the release. In April, 1983, the district court ruled that the release was invalid.
 
 
 11
 The plaintiffs later moved for partial summary judgment seeking a determination that the promissory notes under the loan agreement program were "securities" under the federal securities laws. The defendants cross-motioned on the same issue. The motion was granted in favor of the plaintiffs in April, 1984.
 
 
 12
 In March, 1984, the defendants moved to decertify the class. The plaintiffs moved to bifurcate the trial and this motion was granted. The case continued with a separate trial on the failure to file registration and qualification statements against NMESC and NME. Carlos Royal, the principal shareholder of both companies, was a defendant in this separate trial in order to determine his derivative liability on a control person theory. Max Hollis, who was a director of NME, and Jeffrey Stoffel, who served as counsel for both companies, were also defendants on the same theory.
 
 
 13
 In June, 1984, the jury returned a special verdict finding that NMESC and NME were liable for the offer and sale of unregistered and unqualified securities. Royal was found vicariously liable, but Hollis and Stoffel were not found liable. The district court entered the judgment on July 6, 1984, and certified the action for appeal pursuant to Fed.R.Civ.P. 54(b).
 
 II. SECURITIES
 
 14
 In a grant of partial summary judgment, the district court concluded that the contractual loan agreements/promissory notes were securities under the federal securities laws. The appellants contend that the trial court erred by ruling on the matter before trial, and that genuine factual disputes exist as to certain subsidiary aspects of this circuit's "risk capital" test for determining whether a particular instrument is a "security" under the federal securities laws.
 
 
 15
 The Securities Act of 1933 and the Exchange Act of 1934 include notes within the definition of a security "unless the context otherwise requires." 15 U.S.C. Sec. 77b(1); 15 U.S.C. Sec. 78c(a)(10). The central distinction to be made is whether the particular transaction is an "investment" or a commercial lending situation, the latter of which is outside the scope of the federal securities laws. United California Bank v. THC Financial Corp., 557 F.2d 1351, 1356-1358 (9th Cir.1977). "The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors." United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975). Thus, the Supreme Court has included within the definition of a security "an investment of money in a common enterprise with profits to come solely from the efforts of others." SEC v. W.J. Howey Co., 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946). The definition of a security is not likely to include purely private transactions whose terms are negotiated between lender and borrower. Marine Bank v. Weaver, 455 U.S. 551, 560 & n. 10, 102 S.Ct. 1220, 1225 & n. 10, 71 L.Ed.2d 409 (1982) (profit interest and other negotiated terms in exchange for loan guarantee not a security) (citing Great Western Bank & Trust v. Kotz, 532 F.2d 1252, 1260-62 (9th Cir.1976) (Wright, J., concurring)). The Supreme Court has "repeatedly held that the test 'is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.' " Marine Bank, 455 U.S. at 556, 102 S.Ct. at 1223 (citation omitted). Whether a transaction falls within the "ordinary concept of a security," Marine Bank, 455 U.S. at 556, 102 S.Ct. at 1223, should be determined by "the economic realities underlying a transaction, and not on the name appended thereto." Forman, 421 U.S. at 849, 95 S.Ct. at 2059.
 
 
 16
 Combining the Supreme Court's "economic realities" standard with its emphasis that a security involves an expectation of profits through an enterprise controlled by others, this court has developed the "risk capital" test. United California Bank, 557 F.2d at 1358. "Under the risk capital standard the ultimate question is whether the funding party 'contributed "risk capital" subject to the "entrepreneurial or managerial efforts" of [others].' " Id. (citation omitted).
 
 
 17
 In Great Western Bank & Trust v. Kotz, 532 F.2d 1252, 1257-58 (9th Cir.1976), this court listed six factors, none dispositive, to determine whether the funding party invested "risk capital." These factors are: (1) time; (2) collateralization; (3) form of the obligation; (4) circumstances of issuance; (5) relationship between the amount borrowed and the size of the borrower's business; and (6) the contemplated use of the funds. This list is not exhaustive. Id. at 1258.
 
 
 18
 Applying these factors, the appellants claim the loan agreements were not securities. First, the notes were allegedly callable. Second, the notes were collateralized because they were secured by the appellant's assignment of a beneficial interest in a note secured by a deed of trust. Third, the terms of the loan agreements were negotiable to some degree. Finally, each individual plaintiff's contribution was a small fraction of the total amount used by the appellants.
 
 
 19
 The appellants' distinctions do not persuasively foreclose the classification of these loan agreements as securities. Assuming the notes were callable, this feature was not advertised, and there is little evidence that it was emphasized. Investors were assigned interests in secured notes, and this, too, may have reduced an investor's inclination to exercise the call power. The importance of collateralization in this situation, however, is of limited significance because the choice of collateral was restricted to notes secured by trust deeds selected exclusively by the appellants. Thus, the reliability of the underlying security was left to the skill and business judgment of the appellants. The nature of the scheme shows a representation to hundreds of investors of a prearranged plan to create a general fund for the purchase of notes secured by trust deeds. The logistics of the plan left very little to "negotiation" and did not resemble a commercial lending transaction. The inducement was a return of capital with a profit of ten percent interest. The district court did not err in holding the loan agreements were securities.
 
 III. THE RELEASE
 
 20
 Royal contends that the personal release in the amended plan of reorganization effectively bars the action against him for securities law violations. He argues that the release was approved by the creditors when they accepted the proposed reorganization plan for NMESC which included a release from personal liability. This plan was approved by the bankruptcy court although the parties stipulated that the validity of the release would be left to the district court in the Underhill class action. The district court rejected the release, concluding as a matter of law that the release was ineffective because the bankruptcy court could not discharge the liability of a nondebtor as part of a reorganization plan to discharge the liability of the debtor.
 
 
 21
 Generally, discharge of the principal debtor in bankruptcy will not discharge the liabilities of co-debtors or guarantors. 11 U.S.C. Sec. 524(e) provides: "Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." This section of the 1978 Bankruptcy Reform Act was a reenactment of Section 16 of the 1898 Act which provided that "[t]he liability of a person who is a co-debtor with, or guarantor or in any manner a surety for, a bankrupt shall not be altered by the discharge of such bankrupt." Act of July 1, 1898, ch. 541, Sec. 16, 30 Stat. 550 (formerly codified at 11 U.S.C. Sec. 34 (1976)).
 
 
 22
 In addition, the Bankruptcy Act of 1898, as amended, provided that a corporation's discharge in bankruptcy "shall not release its officers, the members of its board of directors or trustees or of other similar controlling bodies, or its stockholders or members, as such, from any liability under the laws of a State or of the United States." Act of June 22, 1938, ch. 575, Sec. 4(b), 52 Stat. 845 (formerly codified at 11 U.S.C. Sec. 22(b) (1976)). Thus, under the old Act, stockholders or directors could remain liable for substantive violations despite discharge of the corporate entity. 1A J. Moore Collier on Bankruptcy p 16.14, at 1551 (14th ed. 1978).
 
 
 23
 The above statutory provisions underscore the limitations on the bankruptcy court. When a bankruptcy court discharges the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors. Union Carbide Corp. v. Newboles, 686 F.2d 593, 595 (7th Cir.1982) (per curiam). See also In re Kornbluth, 65 F.2d 400, 401 (2d Cir.1933). "The import of Section 16 [of the 1898 Act] is that the mechanics of administering the federal bankruptcy laws, no matter how suggestive, do not operate as a private contract to relieve co-debtors of the bankrupt of their liabilities." Union Carbide, 686 F.2d at 595 (citing R.I.D.C. Industrial Development Fund v. Snyder, 539 F.2d 487, 490 n. 3 (5th Cir.1976), cert. denied, 429 U.S. 1095, 97 S.Ct. 1112, 51 L.Ed.2d 542 (1977)); Beconta, Inc. v. Schneider, 41 B.R. 878, 879 (D.C.E.D.Mich.1984). Consequently, "the payment which effects a discharge is not consideration for any promise by the creditors, much less for one to release non-party obligors." Union Carbide, 686 F.2d at 595.
 
 
 24
 In Union Carbide, for example, the Seventh Circuit held ineffective a release of a guarantor despite its acceptance by the creditors and its confirmation by the bankruptcy court. The bankruptcy court "has no power to discharge the liabilities of a bankrupt's guarantor." 686 F.2d at 595; R.I.D.C. Industrial Development, 539 F.2d at 490 n. 3 ("The bankruptcy court can affect only the relationships of debtors and creditor. It has no power to affect the obligations of guarantors."). Similarly, the bankruptcy court has no power to discharge the liabilities of a nondebtor pursuant to the consent of creditors as part of a reorganization plan. The broad language of Sec. 524(e), limiting the scope of a discharge so that it "does not affect the liability of any other entity," encompasses this result.
 
 IV. ROYAL'S LIABILITY
 
 25
 Royal claims that the jury improperly found him to be vicariously liable for NMESC's violation of the securities laws because the jury instructions regarding control person liability were inadequate, and because the evidence was insufficient to sustain a finding of control person liability.
 
 
 26
 With respect to the instructions, Royal argues that the district court's reading of the statute governing control person liability was insufficient to prevent misguided blurring of the concepts of strict liability and vicarious liability for corporate violations. The district court's instruction stated:
 
 
 27
 In order to establish controlling person liability, you must first determine that the corporation that the individual defendant allegedly controlled is liable to plaintiffs. Under California corporate securities laws, a controlling person is not liable if he establishes the defense that he had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist.
 
 
 28
 The control person statute under California law is substantially the same as the federal statute. Cal.Corp.Code Sec. 25504 (West 1977); 15 U.S.C. Sec. 77o.[1]
 
 
 29
 This court reviews the instructions as a whole, Van Cleef v. Aeroflex Corp., 657 F.2d 1094, 1099 (9th Cir.1981), and determines whether the instructions insure that the jury understands the issues in the case and is not misled in any way. Ragsdell v. Southern Pacific Transportation Co., 688 F.2d 1281, 1282 (9th Cir.1982) (per curiam). "If the instructions given allow a jury to determine intelligently the questions presented, a judgment will not be disturbed simply because further amplification was refused." Id. at 1282-83 (citing Investment Service Co. v. Allied Equities Corp., 519 F.2d 508, 511 (9th Cir.1975)).
 
 
 30
 Taken as a whole, the instructions do not seem misleading or unduly vague. The instructions clearly explained that proof of knowledge was one of three elements which must be found before imposing liability on particular individuals associated with the defendant corporations. The court told the jury that if it found the corporate entity liable and that the director or officer "controlled" the corporation, "the third element" could furnish "a defense by defendants that either Carlos Royal or Max Hollis had no knowledge of, or reasonable grounds to believe in, the facts by reason of which the liability of the control person is alleged to exist. The defendants have the burden of proof on that issue." The distinction between corporate and control person liability was repeated with respect to the state law claim. The substance of the law regarding control person liability and an organized, itemized approach to the issue were presented in the instructions. Royal's challenge to the instructions does not furnish the basis for finding reversible error.
 
 
 31
 With respect to the verdict itself, Royal contends that the jury lacked sufficient evidence to find that he knew or had reasonable grounds to believe that violations of the securities laws were taking place. He argues that he reasonably relied on corporate counsel's advice that the offering was exempt from state qualification requirements. He also argues that he lacked notice of sales to out-of-state residents which undermined the intrastate offering exemption from federal registration requirements.
 
 
 32
 The evidence was sufficient to sustain the jury's finding. Although Royal had received assurance from counsel that the loan agreements were not "securities," he was aware of questions raised by the California Corporations Department with respect to the transactions. Ultimately, liability was found to exist based on the facts that fostered the original doubts regarding the loan agreement program. As to the availability of the intrastate offering exemption from federal registration requirements, advertising the offer by newspaper and radio throughout the San Diego area over a five-year period created a substantial risk of sale to nonresidents of California. Given the duration and breadth of the offering, Royal had reasonable grounds to believe that the intrastate exemption rules may have been violated. The jury's verdict was supported by substantial evidence.
 
 V. NME'S LIABILITY
 
 33
 The appellants contend that the evidence was insufficient to sustain the jury verdict against NME. Specifically, they argue that NME was only a mortgage broker and was not involved in the loan agreement program offered by National Mortgage Exchange of Southern California (NMESC). The plaintiffs contend that there was sufficient evidence of NME's participation in the loan program to justify the imposition of liability.
 
 
 34
 The plaintiffs emphasize several methods by which NME supported NMESC's sale of the securities. For example, the printed advertisement referred only to National Mortgage Exchange and investors were sent NME newsletters. Investors were given financial statements combining the assets of NMESC with those of NME to present a stronger financial position. Moreover, NME executed a franchise agreement with NMESC, allowing the use of the trade name and mark in the conduct of NMESC's business. This affiliated NMESC with the NME group of mortgage brokers. Although the franchise agreement does not expressly authorize use of the trade name and mark with respect to the loan agreement program, NME, through Royal, clearly recognized that the offer appeared to come from National Mortgage Exchange, Inc.
 
 
 35
 NME responds that the use of its name on NMESC advertisements was only a shorthand expression for NMESC. It admits that the assets of the companies were combined in a single financial statement, but says this was done only because Royal controlled both entities.
 
 
 36
 The court instructed the jury that it could find NME liable if it found that NME "offered" the investments, "sold" the investments, took actions that "were both necessary to and a substantial factor in the sales transactions," or took actions that were the direct and proximate cause of the injury. See S.E.C. v. Murphy, 626 F.2d 633, 649-50 (9th Cir.1980). Although NME may not have directly sold the promissory notes to the plaintiffs, the evidence was sufficient to support the verdict against NME as " 'one which could reasonably have been reached.' " Angle v. Sky Chef, 535 F.2d 492, 494 (9th Cir.1976) (citation omitted).
 
 
 37
 With respect to its liability under state law, NME argues on appeal that there was insufficient evidence that NME was in privity with NMESC. Without privity, NME argues, there can be no liability under California securities laws. However, an instruction on privity was not requested. Furthermore, no objection was raised to the court's instruction that the requirements for liability under state securities laws were essentially the same as liability under federal securities laws. If the defendant does not formulate and offer an instruction, the objection is waived. Harmsen v. Smith, 693 F.2d 932, 939 (9th Cir.1982), cert. denied, --- U.S. ----, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); United States v. Burlington Northern, Inc., 500 F.2d 637, 640 (9th Cir.1974). This rule applies unless NME could show that it made its position clear in the trial court before the giving of instructions. Harmsen, 693 F.2d at 939. No such showing has been offered. By effectively waiving an instruction on privity, NME cannot be heard now to challenge the jury's verdict as lacking substantial evidence with respect to the existence of privity.
 
 VI. HOLLIS' LIABILITY
 
 38
 The jury found that NME was liable for violations of federal and state securities laws but did not hold one of NME's directors, Max Hollis, liable as a controlling person of NME. On appeal, the plaintiffs argue that the jury should have found Hollis liable as a control person. The issue for the jury was whether Hollis lacked knowledge of facts giving rise to NME's liability or lacked a reasonable basis to believe in the facts giving rise to liability.
 
 
 39
 The standard of review is essentially the same as the standard governing appeals from an action on a motion for judgment notwithstanding the verdict. This court will not reverse a jury's finding unless the evidence supports only one reasonable conclusion, and that conclusion is contrary to the jury's finding. See Handgards, Inc. v. Ethicon, Inc., 743 F.2d 1282, 1288 (9th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985). This court draws inferences in favor of the party who was successful below and will not weigh the evidence again to reach a result it finds more reasonable so long as the evidence can reasonably support the jury's verdict. William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014, 1026 (9th Cir.1981), cert. denied, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982).
 
 
 40
 Here, the only basis asserted for attaching to Hollis knowledge of the facts giving rise to liability is the plaintiffs' claim that Hollis knew about the collateral loan program. However, the plaintiffs do not point to evidence showing that Hollis was involved in the details of the loan agreement program. They base their claim solely on Hollis' understanding of the operational principles of the collateral loan program. Unlike Royal, who essentially exercised control of both NME and NMESC as the principal shareholder of both companies, Hollis' primary responsibility during the relevant class period (September 30, 1980 to September 8, 1981), was the job of Chief Financial Officer of NME. While the jury found NME was sufficiently involved in the loan agreement program operated by NMESC, it had a reasonable basis to conclude that Hollis himself was not so involved as to furnish a reasonable basis to believe in the facts ultimately giving rise to liability. It may have been reasonable to conclude otherwise, but such a conclusion is not the only one that could have reasonably been reached.
 
 VII. CONCLUSION
 
 41
 We conclude that the sale of promissory notes to numerous investors under the circumstances of this case constitutes a sale of securities within the meaning of state and federal securities laws. Because the sales extended beyond state boundaries, failure to file a registration statement with the S.E.C. violated federal securities laws. As securities, failure to qualify them with the California Department of Corporations violated state law.
 
 
 42
 The trial court did not err by finding Carlos Royal derivatively liable for the violations of NMESC and/or NME. The personal release attached to NMESC's reorganization plan did not relieve him of liability for violations of the securities laws. The instructions at trial were not reversible error and substantial evidence supports the jury verdict against him.
 
 
 43
 Substantial evidence supports a finding of NME's liability as an offeror and/or a participant in the loan agreement program. The jury, however, could reasonably find that Max Hollis, a director of NME, was not derivatively liable for securities law violations resulting from the sale of the promissory notes.
 
 
 44
 AFFIRMED.
 
 
 
 [1]
 Sec. 25504 provides:
 Every person who directly or indirectly controls a person liable under Section 25501 or 25503, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist.
 Sec. 77o provides:
 Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.